**Nell W. CARSON**

v.

**The UNITED STATES.**

**No. 252-59.**

United States Court of Claims.

May 10, 1963.

Reed, J., (Ret.), sitting by designation, and Jones, Chief Judge, dissented.

ward S. Smith, Lyle M. Turner, and Philip R. Miller, Washington, D. C., were on the brief.

Before JONES, Chief Judge, REED, Justice (Ret.), sitting by designation, LARAMORE, DURFEE, and DAVIS, Judges.

DURFEE, Judge.

Plaintiff brings this action for refund of her payment of additional income taxes assessed for the years 1952 through 1956 by the Commissioner of Internal Revenue. The assessment was upon the basis that annual payments made to the widowed plaintiff by a corporation in honor of her deceased husband were not nontaxable "gifts" but were taxable as ordinary income. We are asked by plaintiff to reverse this ruling.

Under section 22(b) (3) of the Internal Revenue Code of 1939 and section 102(a) of the Internal Revenue Code of 1954, "the value of property acquired by gift" is excluded from gross income and consequently exempt from income taxation.

> " * * * The meaning of the term 'gift' as applied to particular transfers has always been a matter of contention. Specific and illuminating legislative history on the point does not appear to exist. * * * The meaning of the statutory term has been shaped largely by the decisional law. * * * " [Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 284, 80 S.Ct. 1190, 1196, 4 L.Ed.2d 1218.]

The Court there reviewed the general principles governing "gifts" in its decision as follows (p. 289, 80 S.Ct. p. 1198):

> " * * * Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience,

John D. Heckert and John McClure, Washington, D. C., for plaintiff. McClure & McClure, Washington, D. C., were on the briefs.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Ed-

and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact. * * *"

This refusal of the Supreme Court to set more definite criteria as requested by the Government for determination of a gift caused Justice Frankfurter to remark in his concurring opinion, "What the Court now does sets fact-finding bodies to sail on an illimitable ocean of individual beliefs and experiences." Before setting sail on such a voyage we shall first examine any available aids to navigation.

■ Foremost in mind is what the Supreme Court stated as "the most critical consideration * * * the transferor's 'intention'". There must be an objective inquiry as to whether what is called a gift amounts to it in reality. The proper criterion is one that inquires whether the *basic reason* for the donor's conduct was in fact *the dominant reason* that explained his action in making the transfer, in the words of Duberstein.

What was the basic reason, the dominant reason, of the directors of the Bottling Works for making the annual payments to plaintiff for the years 1952 to 1956 inclusive?

The initial resolution by the directors of the company in 1938, shortly after the death of their President, John F. Carson, provided as follows:

" * * * Salary to be paid to Nellie W. Carson in 1939 or in any later year is in recognition of services rendered by her husband John F. Carson deceased in 1938."

Thereafter, plaintiff was reelected vice president each year through 1956. She performed no duties for the company in this capacity, and was only nominally a corporate officer. Her salary was specified each year at amounts ranging from $13,200 to $17,160. For the years 1952 through 1955, the minutes of the directors' meetings eliminated the provision for salary, and stated:

"Resolved: that as in past years, in behalf of the stockholders of this corporation, a gift of $17,160.00 be voted to Nellie W. Carson."

This change of phraseology in the resolution occurred as a result of a suggestion of the company's tax advisors with representatives of the Internal Revenue Service concerning the manner in which the Bottling Works should treat such payments for tax purposes. However, the payments were not deducted from gross income in the company's Federal income tax returns *from* 1943 through 1956, following a settlement of tax liability with the Commissioner of Internal Revenue, on this question for the years 1941 and 1943. In any event, "[t]he taxing statute does not make nondeductibility by the transferor a condition on the 'gift' exclusion." Duberstein, supra, p. 287, 80 S.Ct. p. 1198.

The directors testified in this case that the purpose of this change in the resolution was to state, more clearly than the previous resolutions did, the intention with which they authorized the payments throughout. They also testified that the payments they designated as "gifts" were "in honor of," "in memory of," and "in appreciation for the services" of the deceased John F. Carson as founder and president of the company.

■ While due weight must be given to these expressions of intent, we must go further and consider what the Supreme Court described as "the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, * * *." Duberstein, supra, p. 289, 80 S.Ct. p. 1199. This multiplicity of relevant factual elements and their various combinations becomes readily apparent from consideration of the decisions of other Federal courts on "gifts" under the taxing statute. Since Duberstein, there has been an apparent conflict in these decisions, with a resultant multiplicity of the criteria or

tests that were applied. A consideration of these criteria, as applied to the facts in the present case, would appear to be next in order.

Recently, in Poyner v. Commissioner, 301 F.2d 287 (C.A.4, 1962), the Circuit Court of Appeals for the Fourth Circuit applied the five factors listed by the Tax Court in Florence L. Luntz, 29 T.C. 647, 650 (1958), (prior to the Duberstein case), as the "clearest formulation of relevant criteria:"

> "(1) The payments had been made to the wife of the deceased employee and not to his estate;
>
> "(2) There was no obligation on the part of the corporation to pay any additional compensation to the deceased employee;
>
> "(3) The corporation derived no benefit from the payment;
>
> "(4) The wife of the deceased employee performed no services for the corporation;
>
> "(5) The services of her husband had been fully compensated."

Our findings of fact directly respond to every one of these five factors, as we have previously considered them under the principles set down in Duberstein, supra. In each instance, the response is favorable to the widow, as the Court of Appeals also found under the facts in Poyner, supra, except for the third finding that the corporation derived no benefit from the payment. We propose to deal with this separate question later in this opinion.

However, the Court of Appeals in Poyner, supra, also noted that since Duberstein, the Tax Court has considered it necessary to inquire into:

> "(1) the widow's stock holdings in the company;
>
> "(2) the knowledge of the Board of the widow's financial status following the death of her husband;
>
> "(3) and of 'the widow's needs.'"

The Court of Appeals in Poyner accordingly remanded the case for further evidence as to these additional criteria, or any other factors that the Tax Court might consider relevant.

(1) In the present case, the widow never owned any stock of the company in her own name, but after her husband's death she held over one-third of the outstanding stock as trustee of her husband's estate from 1939 through 1956. She was not present at the meeting of the directors in 1938 when the first of the payments to her was authorized after her husband's death, but thereafter, attended most of the meetings from 1939 through 1956, and when present, she voted for the annual payments to be made to her, together with all the other directors.

(2) During each of the years 1939 through 1951, the Board of Directors of the Bottling Works consisted of three persons; Luther F. Carson, brother of the deceased John F. Carson; Lester R. McCool (not related) and plaintiff. Luther F. Carson and his wife also held over one-third of the total outstanding stock. From 1952 through 1956 the board consisted of five persons: the three just mentioned; Wallace Bishop, plaintiff's son-in-law and William Carson, a nephew of John and Luther Carson. Over two-thirds of the stock was held about equally over the entire period 1939 through 1956 between the family of the deceased John F. Carson and the family of his brother, Luther F. Carson. Within such a closely related board of directors, it can be concluded that they had knowledge of plaintiff's substantial financial status after the death of her husband.

(3) The directors, other than plaintiff, although indicating friendship and affection for her, testified that except for their desire to honor the memory of her deceased husband as founder and president of the company, they would not have voted for the payments to plaintiff.

The record does not reveal how the directors arrived at the amount of the annual payments, ranging from $15,000 to

$17,160 a year over a period of 18 years, but these payments are closely comparable to the salary formerly paid to plaintiff's deceased husband. Apparently, the directors took some account of aiding plaintiff in maintaining a living standard comparable to her former married status when they determined the amount of the memorial payments. However, plaintiff reported taxable income for the years involved herein, 1952 through 1956, from $38,000 to $48,371.32, not including the corporate memorial payments. She and her daughter occupied a home valued at $148,886.67 and the cost of its operation and maintenance was paid out of her husband's estate, and they were both residuary beneficiaries of her husband's estate, valued at $1,407,-180.59. Plaintiff as a widow was not in need and the directors of this closely held family corporation must have recognized this fact, even though they may have considered her former standard of living in determining the amount of the memorial payments.

Another factor or criterion has been considered in some of the recent cases, holding that the corporation payments to a widow were not "gifts." Where there is an established policy of an employer to provide for the wife of a deceased officer for a limited period after his death, even though the widow had no enforceable legal right to the payments, these courts have recognized not only the "moral obligation" of the employer to continue the established practice but also the immediate benefits derived by the employer from such a plan. In such cases the payments have been held to be "compensation" and not "gifts" in the sense of the tax statutes. Smith v. Commissioner, 305 F.2d 778 (C.A.3, 1962); Simpson v. United States, 261 F.2d 497, 500 (C.A.7, 1958). This line of decision was recently followed in Gaugler v. United States (C.A.2, 1963), 312 F.2d 681, affirming Dist.Ct. (S.D.N.Y.) 204 F.Supp. 493. The Court there considered certain factors as relevant in approving conclusions of the District Court that the impetus for the payments was "anticipated economic benefits as well as the impelling force of a moral duty."

In applying these same factors from Gaugler, supra, to the facts here, we reach the following conclusions: 1) The accounting and tax treatment by the Bottling Works is not inconsistent with a gift, since the company did not deduct the payments to plaintiff from gross income; 2) There is no evidence of any "previous practice of making similar payments to widows of high officials of the Company;" 3) The computation of the payments to plaintiff amounted to approximately the same amount as the salary received by her deceased husband when president of the company; 4) There is evidence from which it can be inferred that "sound business reasons" were considered by the company in authorizing the payments; 5) There was no "'moral duty' implicit in any special circumstances of the widow's need to readjust to a lower standard of living" such as referred to in Gaugler, supra; and 6) There is no evidence of "the Company's failure to investigate the actual financial circumstances and needs of the widow."

In contending that these payments to plaintiff were not gifts from the Bottling Works, but that they were informal dividends or compensation, the Government has apparently for the first time placed its principal reliance upon the magnitude and duration of the payments as evidence against a "gift" under the tax statute.

In none of the Federal court cases that we have considered was the payment by a corporation to a widow of a deceased officer or employee comparable in magnitude and duration to those in the present case. They ranged from totals of about $20,000 to $60,000 over periods of from one to three years' duration. In none of these cases was the amount or duration of the payments regarded as a separate significant factor. Bounds v. United States, 262 F.2d 876 (C.A.4, 1958); United States v. Allinger, 275 F.2d 421 (C.A.6, 1960); United States v. Kasynski, 284 F.2d 143 (C.A.10, 1960); Kuntz' Estate v. Commissioner, 300 F.2d 849

(C.A.6, 1962); United States v. Frankel, 302 F.2d 666 (C.A.8, 1962); Olsen's Estate v. Commissioner, 302 F.2d 671 (C.A. 8, 1962); Poyner v. Commissioner, 301 F.2d 287 (C.A.4, 1962).

In the present case, the corporate payments to the widow over the eighteen-year period from 1939 through 1956 amounted to a total of $272,880, and a total of $85,880 during the tax period 1952 through 1956 herein at issue. We regard the magnitude and duration of these payments as an additional and significant factor.

If the memorial gift by the Bottling Works in memory and in honor of its deceased president and founder had been for the benefit of persons or projects not associated with its own operation, for example a memorial donation to a college or philanthropic institution, the great magnitude and long duration of this gift would clearly not have the same significance as a comparable gift to a member of a closely held family corporation with attendant economic benefit to that corporation.

■ There is no direct evidence in the record that the directors were actuated by any motive or intention other than that revealed by their own testimony. In the common-law interpretation, this clearly expressed and honorable intention could be determinative of a gift, even though the donor might have anticipated some economic benefit. Nevertheless, their own characterization by the directors of motive or intent is not finally determinative. The intention which we must determine is not to be measured by the common-law concept of gift and "donative intent;" it must contemplate a "gift" within the meaning of the tax statute. Whether the directors, in calling the payments to plaintiff a "gift," were cognizant of the difficult distinction between a common-law gift or a statutory gift is not apparent from the record, but we must measure their expressions of motive within the context of the entire record and by the statutory standards expressed by the courts.

"* * * a voluntary executed transfer of his property by one to another, without any consideration or compensation therefor, though a common-law gift, is not necessarily a 'gift' within the meaning of the statute. For the Court has shown that the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. * * *" [Duberstein, supra, 363 U.S. p. 285, 80 S.Ct. p. 1196.]

All that the court can conclude from the tax record is that the company never claimed the annual payments to the widow as deductible after its tax settlement in 1946, but plaintiff did.

Relevant to the overall inference to be derived from all of these findings is the fact "that the transferor is a corporate entity." Duberstein, supra. This was a closely held family business corporation, and its principal corporate purpose and obligation was to carry on a business and make money for its stockholders. During the tax years 1952 through 1956 herein involved, the company was successful in this principal purpose, and declared the following dividends:

| Years | Dividends |
|---|---|
| 1952 | $168,000 |
| 1953 | 168,000 |
| 1954 | 128,800 |
| 1955 | 128,800 |
| 1956 | 128,800 |

The same amount of dividends per share was declared and paid by the Bottling Works to all its stockholders. Plaintiff was not then a stockholder individually and none of the dividends declared was paid to her as an individual. As trustee under the will of John F. Carson, she held about one-third of the stock in the Bottling Works; she received the same dividends per share that all other stockholders received, and one-half of the residuary income of the trust each year was payable to plaintiff personally.

On the last day of each of the years 1952 through 1956, the Bottling Works

had earned surplus and undivided profits as follows:

| Year | Amount |
|------|--------|
| 1952 | $310,758.83 |
| 1953 | 331,160.37 |
| 1954 | 346,067.60 |
| 1955 | 342,957.14 |
| 1956 | 323,641.50 |

In summary, the company appears to have been highly successful throughout 1952–1956.

Although the record affords no express basis for finding that the initial memorial motive of the directors was diluted by the passage of time in relation to the motivating force of other considerations, the renewal of these annual authorizations of payments appear to have been made largely as a matter of formal corporate custom, except for the years 1941 through 1948, when the annual payments to plaintiff were reduced from $15,000 to $13,200, and thereafter increased to $17,-160, and except for the year 1952 when consideration was given to tax consequences to plaintiff of these payments by the company.

During all this period plaintiff, as trustee of her husband's estate, controlled and voted one-third of the stock. As one of the directors, she voted for these payments from 1939 through 1956, although she did not participate in the original 1938 resolution. All of the other directors but one were related to plaintiff and to each other in some degree during the period 1952 through 1956, and prior thereto. The payments of gift and dividends enabled plaintiff to draw out of the company an amount comparable to that withdrawn by her brother-in-law, Luther F. Carson, successor to her husband as president, who with his family also owned over one-third of the stock, and the two Carson families thus owned a controlling interest of over two-thirds of the total stock. The annual payments to plaintiff are closely comparable to the former salary of the deceased husband of plaintiff as president, and to the salary of the successor president, her brother-in-law, Luther F. Carson.

Considering the close family relationship between the holders of over two-thirds of the company's stock, and the close relationship between most of the directors, it is apparent that this was a highly successful, closely held family corporation both prior to 1938 and thereafter through 1956, and that it was desirable for all concerned to continue this relationship. There is no evidence of dissatisfaction with the company by any of its directors or stockholders. On the contrary, it can be assumed that in the light of their experience with the continuing success of the Bottling Works, everyone was financially interested in maintaining this prosperous and amicable status quo within the two Carson families. This common interest involved maintaining the position of plaintiff, both personally and as an officer of the company on a financial basis comparable to that which had existed prior to her husband's death.

Although the gift cases considered in Duberstein were not on all fours with the present case, the Supreme Court's language is appropriate (363 U.S. p. 285, 80 S.Ct. p. 1196):

"* * * The cases at bar are fair examples of the settings in which the problem usually arises. They present situations in which payments have been made in a context with business overtones * *."

While plaintiff is not in a comparable position with Mr. Duberstein, who claimed that his Cadillac automobile was a "gift" from an automobile agency, we do believe this case also presents a situation in which these payments have been made "in a context with business overtones," as the Court there pointed out.

We note that the directors also voted a salary of $1,200 per year from 1939 to George T. Hunter, a minority stockholder, until his death in 1949, ostensibly for "salary," but without deduction on the company's tax return. Mr. Hunter was connected with the parent Coca Cola bottler from which the company bought its syrup, and it appears that in order to maintain the economic benefit of good

relations with the syrup supplier, the Bottling Works made these ostensible payments of "salary" to a nominal secretary. As counsel for plaintiff have stated in their brief, "It was only good business." Similarly, it was "good business" for the company to maintain good relations with plaintiff in the family corporation, comparable to that which existed before her husband's death.

These total payments of $272,880 over an eighteen-year period were not made solely in honor of the deceased John F. Carson. This was not solely an act of detached and disinterested generosity, of grateful memory, or of merely giving away $272,880 to a well-to-do widow. There was a distinct economic benefit and advantage to the company from making the payments, which, from the totality of the facts, we find was anticipated:

"* * * if the payment proceeds * * * from 'the incentive of anticipated benefit' of an economic nature, * * * it is not a gift. * * A gift in the statutory sense * * proceeds from a 'detached and disinterested generosity, * * *' [Duberstein, supra, 363 U.S. p. 285, 80 S.Ct. p. 1196, citing Bogardus v. Commissioner, 302 U.S. 34, 41, 58 S.Ct. 61, 82 L.Ed. 32; Commissioner v. LoBue, 351 U.S. 243, 246, 76 S.Ct. 800, 100 L.Ed. 1142]."

The burden of proof is upon plaintiff to establish that what is called a "gift" amounts to it in reality; to establish that the donative memorial intent expressed by the company was the basic, dominant reason for the payments. As trier of the fact, we have been directed by the Supreme Court in Duberstein, supra, to rely upon our "experience with the mainsprings of human conduct" in appraising whether the totality of the facts meets the burden of proof. The decisions of other Federal courts following this direction demonstrate diverse and often conflicting judicial appraisals of those mainsprings of human conduct involved in making "gifts" under the tax statute. Rather than add further diversity or conflict in the administration of the income tax law, we have appraised the totality of the facts in this case in the light of Duberstein and all the criteria considered relevant by other courts, and in the light of our own experience, "with the mainsprings of human conduct," as trier of the fact.

Accordingly, we find that the annual payments of $17,160 by the Bottling Works to plaintiff during the years 1952 through 1956 were not "gifts" within the meaning of section 22(b) (3) of the Internal Revenue Code of 1939 and section 102(a) of the Internal Revenue Code of 1954. Plaintiff is not entitled to recover, and therefore, her petition is dismissed.

## II

The Government's counterclaim seeks judgment for $49,717.05 with interest on deficiencies for the years 1952 through 1956, based on a determination that the estate of John F. Carson which was formally closed December 31, 1956, should be treated as having been closed not later than December 31, 1946, and that one-half of the net income of the estate thereafter, including that for the years 1952 through 1956, except 1953, should be treated as distributable and taxable to plaintiff. She was also executrix and trustee under the will.

The Treasury Regulations on Income Tax (1954 Code), sec. 1.641(b)–3 provide in part, as follows:

"If the administration of an estate is unreasonably prolonged, the estate is considered terminated for Federal income tax purposes after the expiration of a reasonable period for the performance by the executor of all the duties of administration. * * * *"

A similar regulation existed under the 1939 Code.

It does appear that between December 31, 1946 and 1956, the estate had sufficient resources to satisfy its indebtedness by any of various arrangements or combinations of arrangements for:

"(a) transfer of assets to the plaintiff and Mrs. Bishop in satisfaction

or reduction of the estate's indebtedness to them, (b) use of the funds distributed to them as income, instead, as a means of reducing the estate's indebtedness to them, and (c) use of cash and Government bonds belonging to the estate to reduce or satisfy the estate's indebtedness."

In 1947, upon petition by plaintiff as executrix of the estate, the County Court in Florida which had jurisdiction of the administration of the estate, found the estate indebted in the sum of $108,-142.01; that most of the assets were stocks in closely held corporations, and that the estate had a large income out of which this indebtedness could be paid without requiring the sale of the corporate stocks at a sacrifice. Accordingly, the court ordered that the executrix could pay the indebtedness from income, and that the estate remain open. Thereafter, the executrix reported to the court as directed in 1951, 1953 and 1955, and each time the County Court renewed its order, keeping the estate open for the reasons hereinabove stated. This was an active and valid exercise of the continuing jurisdiction of the probate court during the last eight years of the administration.

In Frederich v. Commissioner, 145 F. 2d 796, 799, 157 A.L.R. 841 (C.A.5, 1944), the court said:

" * * * In the absence of fraud, or conspiracy to evade taxes, it does not lie within the province of the Tax Court to say that the County Judge abused his discretion in ordering that the administration should be kept open, in compliance with the agreement and desire of all parties in interest that this should be done until such time as the business could be liquidated by an advantageous sale. Those orders of the County Judge's Court were conclusive of the question of whether it was reasonably necessary, or for the best interests of the estate, at the times the orders were made, to keep the estate open, even if the question of the time reasonably necessary to keep the estate open were involved here. The order of the County Judge to continue the business is not subject to be set aside by the Commissioner of Internal Revenue, nor to be collaterally attacked by him in the Tax Court, in the absence of a showing that orders were void on their face. * * * "

In Stewart v. Commissioner, 196 F.2d 397 (C.A.5, 1952), and Chick v. Commissioner, 166 F.2d 337 (C.A.1, 1948), affirming the closing of an estate for Federal tax purposes under the tax regulations, both courts noted the absence of conflicting affirmative action by the state court having jurisdiction.

Without holding that the orders of the Florida Court holding the estate open during the last eight years of administration are conclusive, we do not believe that its lawful orders can be disregarded or lightly weighed in determining their validity of the earlier termination of the estate by the Federal tax authorities. This is particularly true in view of the circumstances. The stock that was finally disposed of in 1956 was sold at a substantial profit; the balance of the indebtedness was paid, and the estate was promptly closed. The executrix had a bona fide purpose in holding the estate open, and it turned out to be good business for the estate and for the Government. There is no evidentiary basis for finding that plaintiff had any purpose to avoid payment of taxes at a higher rate, or that higher aggregate income taxes would have been payable as a consequence of an earlier closing of the estate. (See finding 77.)

Under these facts and circumstances, we conclude that plaintiff has established that the period of administration of the estate of John F. Carson while under the jurisdiction of the County Court in the State of Florida from December 23, 1938 to December 31, 1956 was not unduly or unreasonably prolonged, and was not terminated earlier by operation of law for Federal income tax purposes pursuant to statute or Treasury Regulations.

■ Defendant makes an alternative claim that even if the estate is not deemed closed prior to 1952, the income of the estate used to pay the expenses of the Snell Island home, acquired by the estate after the death of John F. Carson, should be treated as having been distributed to plaintiff and her daughter.

Early in 1939, the estate bought the Snell Island home in St. Petersburg, Florida at a cost of $148,886.67 for use by plaintiff and her daughter. During the period 1952 through 1956, the estate paid the following expenses of operation and maintenance of the Snell Island home:

| "Household Expense: | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|
| Insurance and utilities | $3,203.49 | $1,191.55 | $2,579.89 | $2,972.43 | $1,555.56 |
| Food-supplies-servants | 11,219.92 | 10,413.37 | 8,624.75 | 10,660.11 | 8,474.51 |
| General upkeep and yard | 5,935.13 | 5,707.21 | 11,737.89 | 2,714.15 | 10,518.84 |

"Included among the items * * * as general upkeep and yard are $431.50 in 1955 and $20 in each of the other years for cemetery and mausoleum expenses, $5,470 in 1954 for sea wall repairs at Snell Island, and varying amounts for furniture and appliances, carpeting, flowers, yard work, repairs, painting, hardware, iron gates, and lawn sprinklers."

---

Section 162(c) of the 1939 Internal Revenue Code and sections 661 and 662 of the 1954 Code, provide that income distributed by an estate is taxable to the distributee. The expenditure for $5,470 for sea wall repairs at Snell Island were capital expenditures and not taxable to plaintiff, as defendant concedes. Some of the other expenditures listed are either capital expenditures or made for the maintenance and preservation of the trust estate. Defendant has not requested any more specific finding of fact in this regard, and in this particular aspect of the counterclaim, we find no substantial evidence to establish that a portion of the income of the estate was distributed to plaintiff in connection with the expense of the Snell Island home. We therefore conclude that the alternative claim of defendant under its counterclaim has not been established.

It is therefore ordered that defendant's counterclaim, in its entirety, is dismissed.

REED, Justice (Ret.), sitting by designation (dissenting).

I join that portion of the opinion of the court that holds the transfer of corporate assets was not a gift. However, I feel the court holds incorrectly in de-

ciding that the Commissioner's ruling that the estate should be considered closed by 1952 was erroneous. The history of the estate is set out in detail in our Findings 37 through 77. Suffice it to say that by 1952, fourteen years after the death of the taxpayer's husband, all of the normal functions of administration had been completed. The only outstanding obligations of the estate consisted of debts to the taxpayer and to her daughter, the only other beneficiary of the residuary estate.[1] The estate had borrowed from its beneficiaries at the same time it had purchased the home in which the taxpayer has since resided. Not only could the estate have discharged its indebtedness to the taxpayer and her daughter by transferring the home to them, but during the years prior to 1952 the estate had distributed to its two beneficiaries substantially more money than would have been necessary to discharge the debts. Indeed, the earnings of the estate were even being used to pay the taxpayer's ordinary household expenses.

Eighteen years is far longer than is ordinarily required to wind up the affairs of an estate. The facts indicate no substantial business reason why this estate should have remained open for so long a period. Our Commissioner so

---

1. The estate also owed a relatively small amount to a bank which could easily have been satisfied at any time out of cash, bank deposits, or Government bonds held by the estate.

found,[2] and the taxpayer has taken no exception to his finding. The taxpayer does suggest that the estate was held open to avoid sacrificing closely held corporate stock. This was the grounds upon which the Florida probate court granted permission to keep the estate open. However, it is perfectly clear that the estate could have discharged its debts without selling this stock. See Finding 66. On what basis, then, can we hold that the Commissioner of Internal Revenue erred when he determined that the administration of this estate was unreasonably prolonged.?[3]

The taxpayer and the majority opinion seem to suggest two reasons. First, taxpayer stresses that the estate was held open with the approval of the Florida probate court. The Government argues that since it was not a party to the probate proceedings, which were nonadversary, it is not bound by the orders rendered therein. But I do not doubt either the correctness or the finality of the determination that the estate was held open in accordance with Florida law. Frederich v. Commissioner, 145 F.2d 796, 799 (C.A.5, 1944). However, although relevant, the validity of the procedure followed under state law is not conclusive of the reasonableness of the period for which an estate is held open for federal

---

2. Finding 77(h).

3. Section 641(a) of the 1954 Code provides that "[t]he taxes imposed by this chapter on individuals shall apply to the taxable income of estates * * * including * * * (3) income received by estates of deceased persons during the period of administration or settlement of the estate." 26 U.S.C. § 641(a) (1958 ed.). The same provision under the 1939 Code was found in § 161(a), 26 U.S.C. § 161(a) (1952 ed.).

The regulations under the 1954 Code, slightly expanded but substantively unchanged from prior regulations, provided as follows:

"§ 1.641(b)–3 Termination of estates and trusts

"(a) The income of an estate of a deceased person is that which is received by the estate during the period of administration or settlement. The period of administration or settlement is the period actually required by the administrator or executor to perform the ordinary duties of administration, such as the collection of assets and the payment of debts, taxes, legacies, and bequests, whether the period required is longer or shorter than the period specified under the applicable local law for the settlement of estates. For example, where an executor who is also named as trustee under a will fails to obtain his discharge as executor, the period of administration continues only until the duties of administration are complete and he actually assumes his duties as trustee, whether or not pursuant to a court order. However, the period of administration of an estate cannot be unduly prolonged. If the administration of an estate is unreasonably prolonged, the estate is considered terminated for Federal income tax purposes after the expiration of a reasonable period for the performance by the executor of all the duties of administration. Further, an estate will be considered as terminated when all the assets have been distributed except for a reasonable amount which is set aside in good faith for the payment of unascertained or contingent liabilities and expenses (not including a claim by a beneficiary in the capacity of beneficiary).

*    *    *    *    *

"(d) If a trust or the administration or settlement of an estate is considered terminated under this section for Federal income tax purposes (as for instance, because administration has been unduly prolonged), the gross income, deductions, and credits of the estate or trust are, subsequent to the termination, considered the gross income, deductions, and credits of the person or persons succeeding to the property of the estate or trust."

For a history of the early development of the Commissioner's position on this matter, see Kennedy, Federal Income Taxation of Trusts & Estates § 5.19 (1948 & Supp. 1953). The regulation in its present form has not only survived statutory reenactment, thus assuming much the force of law, see Helvering v. Winmill, 305 U.S. 79, 83, 59 S. Ct. 45, 83 L.Ed. 52 (1938), but also appears in relevant part in the Senate Report on the 1954 Code provisions. S.Rep. No. 1622, 83d Cong., 2d Sess. 340, U.S. Code Cong. and Admin.News 1954, p. 4980.

Taxpayer does not challenge the validity of this regulation, but argues only that the administration of the estate was not unreasonably prolonged.

income tax purposes.[4] Indeed, there is agreement between the majority opinion and the dissent that the action of the Florida court is not conclusive. This conclusion is compelled by the necessity to interpret the tax laws "so as to give a uniform application to a nation wide scheme of taxation." Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L. Ed. 199 (1932); Estate of Putnam v. Commissioner, 324 U.S. 393, 65 S.Ct. 811, 89 L.Ed. 1023 (1948), which of course would be impossible if the probate judges of every state had the power to extend the period of administration for income tax purposes. A state may choose to allow an estate to be used for purposes other than gathering the decedent's assets, paying his debts, and distributing the proceeds among the beneficiaries of the estate. But the provisions recognizing the estate as a separate tax entity were not intended to apply when the estate is used for such other purposes. S.Rep.No.1622, 83d Cong., 2d Sess. 340.

The majority opinion seems to imply that because the estate was not held open for the purpose of tax avoidance, the estate must be recognized as a separate tax entity for the tax years in question. The factual premise on which this argument rests is weak. In 1947, the taxpayer had transferred all but a few thousand dollars out of the estate bank account and had prepared to close the estate; the money was then returned to the estate and permission was requested from the probate court to keep the estate open. Findings 50–53. In the absence of any explanation why the estate was not terminated at that point, it is difficult to conclude that the taxpayer was not attempting to obtain the advantages inherent under a graduated tax system in the use of an additional tax entity.

Moreover, even assuming the absence of any tax-saving purpose, the Commissioner of Internal Revenue was nonetheless entitled to regard the estate as closed in 1952. The absence of tax-saving motive does not establish the taxpayer's right to prolong the administration of the estate any more than the presence of such motivation would defeat her attempt to keep the estate open for tax purposes. "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). See Knetsch v. United States, 364 U.S. 361, 365–366, 81 S.Ct.

---

4. Cases in which it has been held that the administration of an estate has been unreasonably prolonged despite conformity with state law include the following: Stewart v. Commissioner, 196 F.2d 397 (C.A.5, 1952); Chick v. Commissioner, 166 F.2d 337 (C.A.1, 1948), cert. denied, 334 U.S. 845, 68 S.Ct. 1514, 92 L.Ed. 1769; Williams v. Commissioner, 16 T.C. 893 (1951); Hargis v. Commissioner, 19 T.C. 842 (1953); LeFiell v. Commissioner, 19 T.C. 1162 (1953); Caratan v. Commissioner, 14 T.C. 934 (1950); Koffman v. United States, 300 F.2d 176 (C.A. 6, 1962). See 6 Mertens, Federal Income Taxation § 36.47 (1957); Glassmoyer, Termination Problems of Estates & Trusts, N.Y.U. 17th Annual Institute on Federal Taxation 1227–29 (1959). Frederich v. Commissioner, 145 F.2d 796 (C.A.5, 1944), is surely the strongest case to the contrary; however, that decision has repeatedly been distinguished and is of questionable vitality even in the circuit from which it came. Compare Stewart v. Commissioner, supra; Brown v. Commissioner, 215 F.2d 697 (C.A.5, 1954). In any event it does not control here since the decision was premised, whether rightly or wrongly, on the assumption that the probate court had affirmatively ordered the administrator to keep the estate open, 145 F.2d at 799. Here, the taxpayer requested permission not to close the estate, and the probate court merely granted the taxpayer's request. ("It is therefore, considered, adjudged and ordered that the Executrix *may* carry out the program of paying the indebtedness of the estate * * * and that the estate remain open. * * *") There is no reason to believe that the court would have refused to sanction the termination of the estate in 1947.

382

132, 5 L.Ed.2d 128 (1960); National Carbide Corp. v. Commissioner, 336 U.S. 422, 439, 69 S.Ct. 726, 93 L.Ed. 779 (1949). The non-tax purposes for which an estate is held open bear upon the reasonableness of the period for which it is preserved; but in the absence of any substantial non-tax justification for failing to close an estate after the performance of the normal functions of administration, not even ignorance of the very existence of an income tax precludes the Commissioner of Internal Revenue from treating the estate as closed for income tax purposes.

The crucial question thus becomes whether the evidence fairly supports the determination of the Commissioner that the administration of the estate was unreasonably prolonged. Recognizing that the state court has approved the procedure followed here, and that the tax laws do not condition recognition of the estate as a separate tax entity upon adoption of the fastest means possible to settle the estate, we are nonetheless faced with the extreme situation in which an estate, after assuming an obligation to its beneficiaries which enabled the estate to purchase a home for the beneficiaries, and although distributing substantial amounts of income over a number of years to the creditor-beneficiaries, failed to apply any of the amounts distributed to the satisfaction of the indebtedness, or to adopt any of several other obvious and nononerous alternatives to discharge the indebtedness. The reasonableness of ever holding an estate open beyond the period required for the performance of the conventional tasks of administration in order to avoid sacrificing closely-held corporate stock to satisfy an indebtedness which is owed to the beneficiaries of the estate and which was assumed after the death of the decedent and for the immediate benefit of the beneficiaries, is at best questionable. But even assuming that this may be reasonable in some circumstances, certainly prompt steps are required under the regulations to satisfy such an indebtedness when arrangements are available which

would not necessitate a sacrifice of the stock or any other perceptible disadvantage to the estate. Otherwise, I see no reason why any estate holding unsaleable assets could not be held open indefinitely merely by the expedient of borrowing from its beneficiaries and failing to discharge the debt, and by obtaining the acquiescence of the probate court. In short, in the circumstances of this case, it seems to me that the Commissioner could hardly have reached any conclusion other than the one which this court now holds to have been erroneous.

JONES, Chief Judge, joins in the dissent.