Plastic Binding Corporation v. Commissioner. Bertha I. Spinner v. Commissioner.
Plastic Binding Corp. v. Commissioner
Docket Nos. 117-65, 7124-65.
United States Tax Court
T.C. Memo 1967-149; 1967 Tax Ct. Memo LEXIS 109; 26 T.C.M. (CCH) 687; T.C.M. (RIA) 67149; July 13, 1967
*109 Upon the death of the president, founder, and largest shareholder of a corporation, his widow demanded that she be made president and receive an amount equal to his salary for 2 years. Her demands were resisted by other shareholders who controlled 50 percent of the corporation's stock, and a compromise was reached whereby the corporation paid her the equivalent of her late husband's salary for 18 months. Held: Upon the facts, the amounts so received by the widow are includable in her gross income, except for any portion that may be excludable under sec. 101(b), I.R.C. 1954. Held further: The corporation may deduct such amounts in the years they were paid. Maurice P. Wolk, for the petitioner in docket No. 117-65. Bernard H. Sokol, for the petitioner in docket No. 7124-65. James F. Hanley, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: The respondent determined a deficiency in petitioner Bertha I. Spinner's Federal income tax of $12,461.74 for 1961 and $9,764.02 for 1962. In the case of Plastic Binding Corporation, he determined a deficiency in Federal income tax of $14,820 for its taxable year ending September 30, 1961, and $7,410 for its taxable *110 year ending September 30, 1962. In these consolidated proceedings, the issues are whether the amounts which a widow receives from the employer of her deceased husband by reason of his death are gifts or are includable in her gross income as compensation or as dividends, and whether such amounts are deductible by the employer. Findings of Fact Some of the facts were stipulated and those facts are so found. The petitioner in docket No. 7124-65, Bertha I. Spinner (Bertha), resided in Chicago, Illinois, when her petition in this case was filed with this Court. She filed her Federal income tax returns on a calendar year basis for 1961 and 1962 with the district director of internal revenue at Chicago. The petitioner in docket No. 117-65, Plastic Binding Corporation (Plastic), is a Delaware corporation which had its principal office in Chicago, Illinois, when the petition in this proceeding was filed. It used an accrual method of accounting for determining taxable income and filed Federal income tax returns with the district director of internal revenue at Chicago for its taxable years ending on September 30, 1961, and September 30, 1962. Plastic was organized in 1935 and has been engaged *111 in the manufacture of plastic bindings and equipment used in the book binding process. During recent years, the business has been profitable. From 1953 through 1961, Plastic paid a dividend of $16 per share, and in 1962, it was increased to $20 per share. In 1961, the total cash dividends paid amounted to $51,200, approximately two-thirds of its after-tax profits. In 1962, dividends amounted to $64,000 and exceeded after-tax income. The ownership of Plastic was equally divided between two families. Immediately prior to September 1960, the outstanding stock of Plastic was held as follows: Number of
Shareholder
Shares
Isidore Spinner
800
* Isidore Spinner, Trustee
400
Ruth Spinner Rapp
400
John Smart
300
Gwen Smart
233
Edgar G. Richards
200
Florence Richards
333
A. D. Elden
300
Vera Elden
234
3,200
Gwen Smart is the wife of John Smart (Smart); Edgar G. Richards is Smart's brother-in-law; Florence Richards is Smart's sister; A. D. Elden (Elden) is Smart's brother-in-law; the late Vera Elden was Smart's sister. Ruth Spinner Rapp is Isidore Spinner's (Spinner) daughter and is married to Joseph Rapp. Following the death of Spinner, his 800 shares *112 passed to Continental Illinois National Bank and Trust Company (Continental) as executor of his estate. Such stock was included in a residuary bequest to Bertha, Spinner's widow, and the bank would vote such stock in accordance with her wishes unless such action would be inconsistent with its fiduciary duty to preserve the value of the stock. Bertha succeeded Spinner as trustee of the 400 shares held for Mrs. Lloyd Spinner and had the right to vote such shares. Plastic had four directors, and, historically, two were designated by the Spinner family and two by the Smart family. Immediately before Spinner's death, the board of directors was composed of Spinner and Bertha, Smart, and Elden. Relations between the two families were strictly on a business basis. On September 18, 1960, Spinner died leaving Bertha a widow. Spinner was one of the founders of Plastic and was, until his death, its president and chief executive officer, as well as one of its directors. He began work with the corporation in 1935 at a salary of $6,500 per year, which was increased 3 to 5 years later to $10,000. Subsequent salary increases brought his annual compensation to $30,000 by the time of his death. Most *113 of Plastic's employees had been hired by Spinner, and he was in contact with the corporation's customers. Spinner left a will in which he directed his executor "to make every effort" to have Bertha substituted in Spinner's place in all of his business enterprises and to receive all of his salaries and other compensation. It was Continental's policy to treat such language in a will as precatory, requiring the bank's best efforts to accomplish the testator's wishes, but not requiring it to bring a law suit for that purpose. Myron Davis (Davis), a New York lawyer who had some familiarity with the business and other affairs of Plastic since 1939, and who had represented the Smart family, accompanied Smart to the funeral and learned of this will and Bertha's desire to succeed Spinner as president of Plastic. Shortly after he returned to New York, Davis received a call from Harry Schulman (Schulman), a Chicago attorney. Schulman advised Davis that he represented Bertha and the Spinner family. Schulman stated that there were several unresolved questions in connection with Plastic's business and that Bertha desired a meeting of the company's board of directors in Chicago as soon as possible. *114 Early in October 1960, Smart and Davis went to Chicago and met with Elden and Schulman. Schulman demanded that Plastic pay to Bertha the sum of $60,000, which was the equivalent of 2 years of her late husband's salary. Schulman also indicated that Bertha wanted to succeed Spinner as president of Plastic. Smart and Elden, who comprised a majority of the board of directors at that time, did not agree to either request by Schulman. Both before and after Spinner's death, Plastic made salary continuation payments to families of deceased key personnel. In the judgment of Smart and Elden, this policy serves the business and economic interests of Plastic because it improves the morale of key employees and encourages their loyalty to the company. Prior to Spinner's death, salary continuation payments were made to the families of two key employees; since Spinner's death, similar payments were made to the families of two other key workers. Of these deceased employees, only one was a stockholder. Smart and Elden always believed that some payment should be made to Bertha, but they thought that $60,000 was excessive. In determining the amount of salary continuation payments to be made to the family *115 of a deceased employee, Plastic's directors generally took into consideration a number of factors such as the nature and length of the decedent's employment, his contribution to the success of the business, and the salary which he had received from Plastic while alive. Based upon these considerations, Smart believed that Plastic should pay $30,000 to Spinner's widow; Elden felt that she should get not more than $30,000, but possibly less. Since the parties were unable to reach an agreement during the early October meeting, the attorneys, Davis and Schulman, were directed to continue negotiations. In the course of their discussions, Schulman continued to demand $60,000 for Bertha, to ask that she be appointed president of Plastic, and to urge that a new director from the Spinner family be elected to replace Spinner. During the course of the negotiations between the attorneys, Schulman pointed out that because the Spinner and Smart families each owned 50 percent of Plastic's capital stock, either family could prevent a quorum from being present at annual stockholders' meetings and could thereby lead to appointment of a receiver for the company and possibly its ultimate liquidation. Davis *116 notified Smart and Elden of this danger. However, Schulman did not categorically state that if his demands were not met, he would put the company into receivership. Both Smart and Elden were concerned that a continuation of the controversy with Bertha would adversely affect Plastic's business. Both felt that if news of the dispute became known, it would impair the effectiveness and loyalty of key personnel; Elden also felt that customers would react unfavorably to news of the dispute and would take their business elsewhere. Both Smart and Elden were concerned about the difficulty of operating a business which dissension existed between two groups of stockholders, each of whom owned 50 percent of the stock. The parties were unable to come to any agreement regarding the amount to be paid by Plastic to Bertha until the intercession of William M. Funck (Funck) of Continental. He was aware of the negotiations that had taken place and had participated in some of the discussions. By December of 1960, he was concerned about the inability of the parties to settle their dispute and its effect upon the value of the Plastic stock. In that month, he met with Smart and Davis in New York and urged *117 that a settlement be reached with Bertha in order to avoid damage to Plastic's business. Funck recommended as a basis for settlement that Plastic pay $45,000 to Bertha, that Smart be elected president of Plastic, and that Joseph Rapp (Rapp), son-in-law of Bertha, be elected to fill the vacancy on the board of directors. Early in January 1961, Plastic issued a call for a meeting of its board of directors to be held in Chicago on January 24, 1961, for the purpose of declaring the annual dividend to stockholders. However, at the request of Funck, a preliminary meeting was arranged for January 23, 1961, at which were present Smart, Elden, Schulman, Rapp, Davis, and Funck, but not Bertha. At this meeting, Funck again urged the best interests of Plastic required a settlement of the dispute concerning the payments to be made by Plastic to Bertha. After some discussion, the board of directors adopted the proposals made by Funck. It was agreed that $30,000 would be paid to Bertha on January 24, 1961, and $15,000 on January 15, 1962. In addition, it was agreed that Plastic would pay its regular annual dividend of $16 per share. Since all matters had been agreed upon, it was concluded that the *118 preliminary meeting would serve as the meeting of the board of directors which had been called for the following day. The minutes of this meeting were prepared by Schulman and Davis. They reported the adoption by the board of directors of the following resolution: WHEREAS, Mr. Isidore Spinner was one of the founders of this corporation and faithfully and loyally served this corporation as President and member of the Board of Directors; and WHEREAS, Mr. Spinner's noble character, integrity and sense of fair play commanded respect and affection of the employees and officers of the corporation; NOW, THEREFORE, BE IT RESOLVED that this Board of Directors record in the Minutes of the affairs of the corporation, its expression of sympathy and bereavement at the passing of Isidor Spinner and that this resolution be made a permanent record in the Minutes of this corporation and copies thereof be delivered to his beloved wife, Mrs. Bertha Spinner, and to his children. BE IT FURTHER RESOLVED that as a material expression of sympathy and kindness to Mrs. Bertha Spinner, widow of Isidore Spinner, and motivated by a deep sense of affection, respect and admiration for the family of Isidore Spinner, *119 there shall be paid to Mrs. Bertha Spinner the sum of $45,000.00, payable as follows: $30,000.00 on January 24, 1961, and the balance of $15,000.00 on January 15, 1962. Davis regarded the language of the resolution as sincere but mere "window dressing". In approving this resolution, Smart and Elden considered that it reflected as good a settlement as could be secured, that a settlement of the dispute was necessary in the interests of employee morale and customer goodwill, that Spinner had received small compensation in the early years of the corporation, and that the payment of some amount to Bertha was consistent with the prior practices of the corporation. Smart had some affection and sympathy for Bertha, but in agreeing to the payments to her, he was primarily motivated by Spinner's loyalty and devotion to the business. Smart was unaware of Bertha's financial situation. The payments to Bertha were made in accordance with the resolution. Davis delivered her first check to Schulman for surrender to her only when she had signed a waiver of notice of the directors' meeting held January 23, 1961. The stub of such check bore the notation, "Payment per Corporate Resolution". Davis forwarded *120 Bertha's second check to her directly with a covering letter stating that it was the "final installment of the gift which the Directors made". The stub of this check bore the notation "Welfare Expense". Despite the testimony of Smart and Elden as to their reasons for making the payments to Bertha, the amount of those payments was not disclosed by them to the employees of Plastic; nevertheless, some of the employees learned about the payments. Bertha did not report the payments of $30,000 and $15,000 that she received from Plastic in her Federal income tax returns for the taxable years 1961 and 1962. However, Plastic deducted the payments from gross income in its returns for the taxable years ended September 30, 1961, and September 30, 1962, under "Other Deductions" an designated them "Gratuity Paid to Widow of Deceased Officer". Opinion In this case, we meet again the question of whether payments which a widow receives from the employer of her deceased husband are to be treated as gifts, as compensation, or as dividends. Since we have consolidated the case of the widow and the case of the employer, we have all points of view represented - the widow arguing that the payments are gifts, *121 the employer treating them as compensation, and the respondent taking the position that they are dividends. To decide upon the proper tax treatment of the payments, we must again apply the principles of Commissioner v. Duberstein, 363 U.S. 278 (1960): We take it that the proper criterion, established by decision here, is one that inquires what the basic reason for his conduct was in fact - the dominant reason that explains his action in making the transfer. [363 U.S. at 286] * * *
For the Court has shown that the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 730. And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, Bogardus v. Commissioner, 302 U.S. 34, 41, it is not a gift. And, conversely, "[where] the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." Robertson v. United States, 343 U.S. 711, 714.7. A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested *122 generosity," Commissioner v. LoBue, 351 U.S. 243, 246; "out of affection, respect, admiration, charity or like impulses." Robertson v. United States, supra, at 714. [Footnote omitted.] [363 U.S. at 285] In applying these principles, we must pursue the elusive motive or motives for making the payments. In this case, as in most cases, there is in truth a multiplicity of motives. Thus, our task is to first identify the motives and then form a judgment as to which motive or combination of motives is dominant. In ascertaining the dominant motive, we must carefully examine all the surrounding circumstances, including the statements of the parties at the time the payments were made. Though we must give proper weight to such statements, we must also recognize that the parties have engaged in some "window dressing", and we must look through the window and find out what was behind it. Carson v. United States, 317 F. 2d 370 (Ct. Cl. 1963). In this case, there is little persuasive evidence that the payments to Bertha were gifts. It is true that several of the contemporaneous statements referred to them as gifts. The resolution authorizing the payments did state that they were in part motivated *123 by affection, respect, and admiration. In the letter transmitting the second payment, it was alluded to as a gift; and on the check stub, it was described as a "welfare expense". Finally, in the tax returns, the payments were referred to as "gratuities". Yet, we are not persuaded by these statements. Davis, the lawyer who participated in drafting the resolution, testified that the language was "window dressing"; he also prepared the letter referring to the payment as a gift. Cf. Lucile McCrea Evans, 39 T.C. 570 (1962), affd. per curiam 330 F. 2d 518 (C.A. 6, 1964). Furthermore, the references on the check stub and in the tax returns reflect merely the language chosen by some employees to describe the payments, not the language of the directors who made the decision to make the payments and not corporate policy. We think that the conduct of the parties is much more reliable in revealing the reasons for making these payments. Bertha engaged a lawyer to present her demands, and he demanded that she receive an amount equal to her deceased husband's salary for 2 years. He impliedly threatened to bring about the liquidation of the corporation if her demands were not satisfied. Although *124 her initial demands were not accepted, he persevered until Funck, the bank officer, brought about a compromise. $2Cf. Mary C. Westphal, 37 T.C. 340 (1961). The ultimate settlement of the dispute was proposed by Funck, who surely was not acting out of any desire to make a gift to Bertha; he was fulfilling his fiduciary responsibility of protecting the value of the stock which he held as executor of the estate. Looking at the payments from the other point of view, we find that the directors, Smart and Elden, who were responsible for deciding to make them, were not primarily motivated by any wish to make a gift to Bertha. They thought that the $45,000 figure was the best settlement that could be secured. They believed that because of Spinner's long devotion to the business, at a modest salary in the early years, some payment should be made to Bertha. Smith v. Commissioner, 305 F. 2d 778 (C.A. 3, 1962), affg. a Memorandum Opinion of this Court, cert. denied 371 U.S. 904 (1962). They wanted to maintain good morale among the employees and good relations with the customers of the business. Helen Rich Findlay, 39 T.C. 580 (1962), affd. in part and revd. in part on other issues 332 F. 2d 620 *125 (C.A. 2, 1964); Irving S. Wright, 39 T.C. 597 (1962), affd. in part and revd. in part on other issues 336 F. 2d 121 (C.A. 2, 1964). Smart testified that although he had some feeling of affection toward Bertha, he agreed to the payments primarily because of Spinner's devotion to the business. Cf. Gaugler v. United States, 312 F. 2d 681 (C.A. 2, 1963). Furthermore, since Smart had no knowledge of Bertha's financial situation, he could not have been motivated by any belief that she needed financial assistance. Fritzel v. United States, 339 F. 2d 995 (C.A. 7, 1964); Margaret H. D. Penick, 37 T.C. 999 (1962). Clearly, there was no contractual obligation to make the payments, but Smart and Elden testified that the corporation had a policy of making payments to the families of key deceased employees. The evidence supporting this testimony is slight in that in only two cases had such payments been made before Spinner's death. However, although the payments that were made after Spinner's death to the families of deceased employees could not have influenced his expectations, the fact that such payments were made does tend to support the testimony of the directors. Hence, we have found *126 that one of the motives for making the payments was the belief of the directors that the corporation had a policy to make such payments. Cf. Tomlinson v. Hine, 329 F. 2d 462 (C.A. 5, 1964); Simpson v. United States, 261 F. 2d 497 (C.A. 7, 1958), cert. denied 359 U.S. 944 (1959). All these circumstances taken together convince us that the payments to Bertha did not arise primarily out of any detached and disinterested generosity or affection. To the contrary, it seems altogether clear that the primary purposes for making the payments were to further the business of Plastic and to provide a form of additional compensation for the services of a very valuable employee. Cronheim's Estate v. Commissioner, 323 F. 2d 706 (C.A. 8, 1963), affg. a Memorandum Opinion of this Court These were business transactions in which Bertha was demanding all that she could secure and in which the directors, although they were willing to pay something, had to settle for the best bargain that could be arranged. Accordingly, we conclude that the payments to Bertha are not gifts and are includable in her gross income except to the extent that any portion of them may be excludable under section 101(b) of the Internal Revenue Code of 1954. *127 [1]
The reasons which have led us to conclude that the payments to Bertha are not gifts also lead us to conclude that Plastic can deduct such payments. Since the payments were reasonable in amount and were primarily motivated by a belief that additional compensation should be paid for the services of Spinner and by a desire to assure the continuing successful operation of the business, the payments meet the ordinary and necessary test of sections 162 and 404(a)(5). Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930); Fifth Avenue Coach Lines, Inc., 31 T.C. 1080 (1959), affd. in part and revd. in part on other issues 281 F. 2d 556 (C.A. 2, 1960), cert. denied 366 U.S. 964 (1961); Champion Spark Plug Co., 30 T.C. 295 (1958), affd. 266 F. 2d 347 (C.A. 6, 1959). The respondent has suggested that the payments to Bertha are not deductible under section 404(a)(5) because that section requires the existence of a plan and there is no such plan in this case. However, section 404(b) provides that if there is a method of employer compensation which has the effect of a plan of deferred compensation, the plan requirement of section 404(a) *128 is met; [2] and section 1.404(a)-12, Income Tax Regs., provides in effect that if death benefit payments are made to the beneficiaries of a single employee and the requirements of section 162 are satisfied, such payments have the effect of a deferred compensation plan. [3] Thus, it appears that the arrangement to make the payments to Bertha satisfies the plan requirement of section 404. These comments also dispose of the respondent's contention that payments were *129 dividends. There is some indication that because of the amount of stock which she owned or controlled, Bertha may have received more than she otherwise would have. Notwithstanding this indication, we do not find it sufficiently convincing to conclude that the payments were dividends. It seems that primarily the payments were made as a form of additional compensation; her stock ownership, at the most, merely affected the amount of the payments. This circumstance is not enough to change the character of the payment from one of compensation to one constituting a distribution of earnings. John C. Nordt Co., 46 T.C. 431 (1966). Moreover, although Bertha owned or controlled a large block of the Plastic stock, this case is clearly distinguishable from Barbourville Brick Co., 37 T.C. 7 (1961). Her ownership and control is not such that she can direct the corporation to distribute its earnings to her. Compare, Schner-Block Company v. Commissioner, 329 F. 2d 875 (1964), affg. a Memorandum Opinion of this Court. In fact, since one-half of the stock is owned by the Smart family, we feel sure that they would not agree to such a substantial distribution of earnings to a member of the Spinner *130 family without some comparable arrangement for the Smart family, and we have no evidence in this case of any agreement or understanding that a like distribution is to be made to the Smart family. In order to reflect our resolution of the issues and an adjustment of Plastic's income not placed in issue by the petition, Decisions will be entered under Rule 50. Footnotes
*. Beneficial ownership of these shares was in Mrs. Lloyd Spinner.↩
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. SEC. 404(b)↩. Method of Contributions, etc., Having the Effect of a Plan. - If there is no plan but a method of employer contributions or compensation has the effect of a stock bonus, pension, profit-sharing, or annuity plan, or similar plan deferring the receipt of compensation, subsection (a) shall apply as if there were such a plan. 3. "* * * Similarly, if amounts are paid as a death benefit to the beneficiaries of an employee (for example, by continuing his salary for a reasonable period), and if such amounts meet the requirements of section 162 or 212, such amounts are deductible under section 404(a)(5) in any case when they are not deductible under the other paragraphs of section 404(a)." Sec. 1.404(a)-12, Income Tax Regs.↩