KNETSCH ET UX. *v.* UNITED STATES.

No. 23.   Argued October 17–18, 1960.—Decided November 14, 1960.

*W. Lee McLane, Jr.* argued the cause for petitioners. With him on the brief was *Nola M. McLane.*

*Grant W. Wiprud* argued the cause for the United States.   With him on the brief were *Solicitor General*

*Rankin, Assistant Attorney General Rice* and *Harry Baum.*

*Richard H. Appert, Converse Murdoch* and *Douglas W. McGregor* filed briefs, as *amici curiae,* urging reversal.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case presents the question of whether deductions from gross income claimed on petitioners' 1953 and 1954 joint federal income tax returns, of $143,465 in 1953 and of $147,105 in 1954, for payments made by petitioner, Karl F. Knetsch, to Sam Houston Life Insurance Company, constituted "interest paid . . . on indebtedness" within the meaning of § 23 (b) of the Internal Revenue Code of 1939 and § 163 (a) of the Internal Revenue Code of 1954.[1] The Commissioner of Internal Revenue disallowed the deductions and determined a deficiency for each year. The petitioners paid the deficiencies and brought this action for refund in the District Court for the Southern District of California. The District Court rendered judgment for the United States, and the Court of Appeals for the Ninth Circuit affirmed, 272 F. 2d 200. Because of a suggested conflict with the decision of the Court of Appeals for the Fifth Circuit in *United States* v. *Bond,* 258 F. 2d 577, we granted certiorari, 361 U. S. 958.

On December 11, 1953, the insurance company sold Knetsch ten 30-year maturity deferred annuity savings bonds, each in the face amount of $400,000 and bearing interest at 2½% compounded annually. The purchase price was $4,004,000. Knetsch gave the Company his check for $4,000, and signed $4,000,000 of nonrecourse annuity loan notes for the balance. The notes bore

---

[1] The relevant words of the two sections are the same, namely that there shall be allowed as a deduction "All interest paid or accrued within the taxable year on indebtedness . . . ."

3½% interest and were secured by the annuity bonds. The interest was payable in advance, and Knetsch on the same day prepaid the first year's interest, which was $140,000. Under the Table of Cash and Loan Values made part of the bonds, their cash or loan value at December 11, 1954, the end of the first contract year, was to be $4,100,000. The contract terms, however, permitted Knetsch to borrow any excess of this value above his indebtedness without waiting until December 11, 1954. Knetsch took advantage of this provision only five days after the purchase. On December 16, 1953, he received from the company $99,000 of the $100,000 excess over his $4,000,000 indebtedness, for which he gave his notes bearing 3½% interest. This interest was also payable in advance and on the same day he prepaid the first year's interest of $3,465. In their joint return for 1953, the petitioners deducted the sum of the two interest payments, that is $143,465, as "interest paid . . . within the taxable year on indebtedness," under § 23 (b) of the 1939 Code.

The second contract year began on December 11, 1954, when interest in advance of $143,465 was payable by Knetsch on his aggregate indebtedness of $4,099,000. Knetsch paid this amount on December 27, 1954. Three days later, on December 30, he received from the company cash in the amount of $104,000, the difference less $1,000 between his then $4,099,000 indebtedness and the cash or loan value of the bonds of $4,204,000 on December 11, 1955. He gave the company appropriate notes and prepaid the interest thereon of $3,640. In their joint return for the taxable year 1954 the petitioners deducted the sum of the two interest payments, that is $147,105, as "interest paid . . . within the taxable year on indebtedness," under § 163 (a) of the 1954 Code.

The tax years 1955 and 1956 are not involved in this proceeding, but a recital of the events of those years is

necessary to complete the story of the transaction. On December 11, 1955, the start of the third contract year, Knetsch became obligated to pay $147,105 as prepaid interest on an indebtedness which now totalled $4,203,000. He paid this interest on December 28, 1955. On the same date he received $104,000 from the company. This was $1,000 less than the difference between his indebtedness and the cash or loan value of the bonds of $4,308,000 at December 11, 1956. Again he gave the company notes upon which he prepaid interest of $3,640. Petitioners claimed a deduction on their 1955 joint return for the aggregate of the payments, or $150,745.

Knetsch did not go on with the transaction for the fourth contract year beginning December 11, 1956, but terminated it on December 27, 1956. His indebtedness at that time totalled $4,307,000. The cash or loan value of the bonds was the $4,308,000 value at December 11, 1956, which had been the basis of the "loan" of December 28, 1955. He surrendered the bonds and his indebtedness was canceled. He received the difference of $1,000 in cash.

The contract called for a monthly annuity of $90,171 at maturity (when Knetsch would be 90 years of age) or for such smaller amount as would be produced by the cash or loan value after deduction of the then existing indebtedness. It was stipulated that if Knetsch had held the bonds to maturity and continued annually to borrow the net cash value less $1,000, the sum available for the annuity at maturity would be $1,000 ($8,388,000 cash or loan value less $8,387,000 of indebtedness), enough to provide an annuity of only $43 per month.

The trial judge made findings that "[t]here was no commercial economic substance to the . . . transaction," that the parties did not intend that Knetsch "become indebted to Sam Houston," that "[n]o indebtedness of [Knetsch] was created by any of the . . . transactions," and that

"[n]o economic gain could be achieved from the purchase of these bonds without regard to the tax consequences . . . ." His conclusion of law, based on this Court's decision in *Deputy* v. *du Pont,* 308 U. S. 488, was that "[w]hile in form the payments to Sam Houston were compensation for the use or forbearance of money, they were not in substance. As a payment of interest, the transaction was a sham."

We first examine the transaction between Knetsch and the insurance company to determine whether it created an "indebtedness" within the meaning of § 23 (b) of the 1939 Code and § 163 (a) of the 1954 Code, or whether, as the trial court found, it was a sham. We put aside a finding by the District Court that Knetsch's "only motive in purchasing these 10 bonds was to attempt to secure an interest deduction." [2] As was said in *Gregory* v. *Helvering,* 293 U. S. 465, 469: "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. . . . But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."

When we examine "what was done" here, we see that Knetsch paid the insurance company $294,570 during the two taxable years involved and received $203,000 back in the form of "loans." What did Knetsch get for the out-of-pocket difference of $91,570? In form he had an annuity contract with a so-called guaranteed cash value at maturity of $8,388,000, which would produce monthly annuity payments of $90,171, or substantial life insurance proceeds in the event of his death before maturity. This,

---

[2] We likewise put aside Knetsch's argument that, because he received ordinary income when he surrendered the annuities in 1956, he has suffered a net loss even if the contested deductions are allowed, and that therefore his motive in taking out the annuities could not have been tax avoidance.

as we have seen, was a fiction, because each year Knetsch's annual borrowings kept the net cash value, on which any annuity or insurance payments would depend, at the relative pittance of $1,000.[3] Plainly, therefore, Knetsch's transaction with the insurance company did "not appreciably affect his beneficial interest except to reduce his tax . . . ." *Gilbert* v. *Commissioner*, 248 F. 2d 399, 411 (dissenting opinion). For it is patent that there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction. What he was ostensibly "lent" back was in reality only the rebate of a substantial part of the so-called "interest" payments. The $91,570 difference retained by the company was its fee for providing the façade of "loans" whereby the petitioners sought to reduce their 1953 and 1954 taxes in the total sum of $233,297.68. There may well be single-premium annuity arrrangements with nontax substance which create an "indebtedness" for the purposes of § 23 (b) of the 1939 Code and § 163 (a) of the 1954 Code. But this one is a sham.[4]

---

[3] Petitioners argue further that in 10 years the net cash value of the bonds would have exceeded the amounts Knetsch paid as "interest." This contention, however, is predicated on the wholly unlikely assumption that Knetsch would have paid off in cash the original $4,000,000 "loan."

[4] Every court which has considered this or similar contracts has agreed with our conclusion, except the Court of Appeals for the Fifth Circuit in the *Bond* case and one District Court bound by that decision, *Roderick* v. *United States*, 59–2 U. S. T. C. ¶ 9650. See *Diggs* v. *Commissioner*, 281 F. 2d 326 (C. A. 2d Cir.), pending on petition for certiorari (later denied, *post*, p. 908); *Emmons and Weller* v. *Commissioner*, 270 F. 2d 294 (C. A. 3d Cir.), pending on petitions for certiorari (later denied, *post*, p. 908); *Haggard* v. *United States*, 59–1 U. S. T. C. ¶ 9299; *Oliver L. Williams*, 18 T. C. M. 205. See also Rev. Rul. 54–94, 1954–1 Cum. Bull. 53, and the dissenting opinion of Judge Wisdom in *Bond*.

The petitioners contend, however, that the Congress in enacting § 264 of the 1954 Code authorized the deductions. They point out that § 264 (a)(2) denies a deduction for amounts paid on indebtedness incurred to purchase or carry a single-premium annuity contract, but only as to contracts purchased after March 1, 1954.[5] The petitioners thus would attribute to Congress a purpose to allow the deduction of pre-1954 payments under transactions of the kind carried on by Knetsch with the insurance company without regard to whether the transactions created a true obligation to pay interest. Unless that meaning plainly appears we will not attribute it to Congress. "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." *Gregory* v. *Helvering, supra,* p. 470. We, therefore, look to the statute and materials relevant to its construction for evidence that Congress meant in § 264 (a)(2) to authorize the deduction of payments made under sham transactions entered into before 1954. We look in vain.

Provisions denying deductions for amounts paid on indebtedness incurred to purchase or carry insurance contracts are not new in the revenue acts. A provision applicable to all annuities, but not to life insurance or endowment contracts, was in the statute from 1932 to 1934, 47 Stat. 179. It was added at a time when Congress was

---

[5] Section 264 (a)(2) provides:

"(a) GENERAL RULE.—No deduction shall be allowed for—

. . . . .

"(2) Any amount paid or accrued on indebtedness incurred or continued to purchase or carry a single premium life insurance, endowment, or *annuity contract.*

"*Paragraph (2) shall apply in respect of annuity contracts only as to contracts purchased after March 1, 1954.*" (Emphasis supplied.)

The substance of the section without the italicized language was added to the 1939 Code in 1942. 56 Stat. 827.

developing a policy to deny a deduction for interest allocable to tax-exempt income;[6] the proceeds of annuities were excluded from gross income up to the amount of the consideration paid in by the annuitant. See H. R. Rep. No. 708, 72d Cong., 1st Sess., p. 11. The provision was repealed by the Revenue Act of 1934, 48 Stat. 688, when the method by which annuity payments were taken into gross income was changed in such way that more would be included. 48 Stat. 687. See S. Rep. No. 558, 73d Cong., 2d Sess., p. 24.

Congress then in 1942 denied a deduction for amounts paid on indebtedness incurred to purchase single-premium life insurance and endowment contracts. This provision was enacted by an amendment to the 1939 Code, 56 Stat. 827, "to close a loophole" in respect of interest allocable to partially exempt income. See Hearings before Senate Finance Committee on H. R. 7378, 77th Cong., 2d Sess., p. 54; § 22 (b)(1) of the 1939 Code (now § 101 (a)(1) of the 1954 Code).

The 1954 provision extending the denial to amounts paid on indebtedness incurred to purchase or carry single-premium annuities appears to us simply to expand the application of the policy in respect of interest allocable to partially exempt income. The proofs are perhaps not as strong as in the case of life insurance and endowment contracts, but in the absence of any contrary expression of the Congress, their import is clear enough. There is

---

[6] See § 23 (b) of the Revenue Act of 1932, 47 Stat. 179, which provided:

"(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except (1) on indebtedness incurred or continued to purchase or carry obligations or securities (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this title, or (2) on indebtedness incurred or continued in connection with the purchasing or carrying of an annuity."

*first* the fact that the provision was incorporated in the section covering life insurance and endowment contracts, which unquestionably was adopted to further that policy. There is *second* the fact that Congress' attention was directed to annuities in 1954; the same 1954 statute again changed the basis for taking part of the proceeds of annuities into gross income. See § 72 (b) of the 1954 Code. These are signs that Congress' long-standing concern with the problem of interest allocable to partially exempt income, and not any concern with sham transactions, explains the provision.

Moreover the provision itself negates any suggestion that sham transactions were the congressional concern, for the deduction denied is of certain interest payments on actual "indebtedness." And we see nothing in the Senate Finance and House Ways and Means Committee Reports on § 264, H. R. Rep. No. 1337, 83d Cong., 2d Sess., p. 31; S. Rep. No. 1622, 83d Cong., 2d Sess., p. 38, to suggest that Congress in exempting pre-1954 annuities intended to protect sham transactions.[7]

---

[7] The Reports are as follows:

"Under existing law, no interest deduction is allowed in the case of indebtedness incurred, or continued, to purchase a single-premium life-insurance or endowment contract. . . .

"Existing law does not extend the denial of the interest deduction to indebtedness incurred to purchase single-premium annuity contracts. It has come to your committee's attention that a few insurance companies have promoted a plan for selling annuity contracts based on the tax advantage derived from omission of annuities from the treatment accorded single-premium life-insurance or endowment contracts. The annuity is sold for a nominal cash payment with a loan to cover the balance of the single-premium cost of the annuity. Interest on the loan (which may be a nonrecourse loan) is then taken as a deduction annually by the purchaser with a resulting tax saving that reduces the real interest cost below the increment in value produced by the annuity.

"Your committee's bill will deny an interest deduction in such cases but only as to annuities purchased after March 1, 1954."

Some point is made in an *amicus curiae* brief of the fact that Knetsch in entering into these annuity agreements relied on individual ruling letters issued by the Commissioner to other taxpayers. This argument has never been advanced by petitioners in this case. Accordingly, we have no reason to pass upon it.

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART concur, dissenting.

I agree with the views expressed by Judge Moore in *Diggs* v. *Commissioner,* 281 F. 2d 326, 330–332, and by Judge Brown, writing for himself and Judge Hutcheson, in *United States* v. *Bond,* 258 F. 2d 577.

It is true that in this transaction the taxpayer was bound to lose if the annuity contract is taken by itself. At least the taxpayer showed by his conduct that he never intended to come out ahead on that investment apart from this income tax deduction. Yet the same may be true where a taxpayer borrows money at 5% or 6% interest to purchase securities that pay only nominal interest; or where, with money in the bank earning 3%, he borrows from the selfsame bank at a higher rate. His aim there, as here, may only be to get a tax deduction for interest paid. Yet as long as the transaction itself is not hocus-pocus, the interest charges incident to completing it would seem to be deductible under the Internal Revenue Code as respects annuity contracts made prior to March 1, 1954, the date Congress selected for terminating this class of deductions. 26 U. S. C. § 264. The insurance company existed; it operated under Texas law; it was authorized to issue these policies and to make these annuity loans. While the taxpayer was obligated to pay interest at the rate of 3½% per annum, the annuity bonds increased

in cash value at the rate of only 2½% per annum. The insurance company's profit was in that 1-point spread.

Tax avoidance is a dominating motive behind scores of transactions. It is plainly present here. Will the Service that calls this transaction a "sham" today not press for collection of taxes* arising out of the surrender of the annuity contract? I think it should, for I do not believe any part of the transaction was a "sham." To disallow the "interest" deduction because the annuity device was devoid of commercial substance is to draw a line which will affect a host of situations not now before us and which, with all deference, I do not think we can maintain when other cases reach here. The remedy is legislative. Evils or abuses can be particularized by Congress. We deal only with "interest" as commonly understood and as used across the board in myriad transactions. Since these transactions were real and legitimate in the insurance world and were consummated within the limits allowed by insurance policies, I would recognize them tax-wise.

---

*Petitioners terminated this transaction in 1956 by allowing the bonds to be cancelled and receiving a check for $1,000. The termination was reflected in their tax return for 1956. It might also be noted that the insurance company reported as gross income the interest payments which it received from petitioners in 1953 and 1954.