WILLIAM R. LOVETT AND AGNES D. LOVETT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71565. Filed November 22, 1961.

*Douglas W. McGregor, Esq., Edward McCarthy, Esq.,* and *John M. Markley, Esq.,* for the petitioners.

*Harold Friedman, Esq.,* for the respondent.

322

## OPINION.

Black, *Judge:* The sole question presented is whether petitioner may deduct during the years in issue amounts paid to the Sam Houston Life Insurance Company as "interest" on "premium" and "supplemental loans." Petitioner contends that the amounts paid constituted interest on indebtedness incurred in the purchase of three annuity policies, and that such interest is deductible under section 163(a) of the 1954 Code.[1] Respondent, on the other hand, contends that the entire transaction relative to the purchase of the policies

---

[1] SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

lacks economic substance, and that under the rule of law announced in *Knetsch* v. *United States*, 364 U.S. 361 (1960), the deductions must be disallowed.[2]

The *Knetsch* case involved the issue of the deductibility of "interest" payments made by a taxpayer in connection with the purchase of a single-premium annuity with funds largely "borrowed" from the same Sam Houston Life Insurance Company. The taxpayer argued in that case that it was the intent of Congress that such interest be deductible.

When we examine "what was done" in the instant case, we find that *in form*, petitioner, at age 64[3] undertook to purchase two 30-year and one 20-year deferred annuity policies for total annual premiums of $3 million so that commencing in his 84th year he would begin to receive monthly payments of $279,137.90 and in his 94th year, total monthly payments of $1,288,588.92. *In form*, petitioner borrowed $2,997,000 from Insurance in 1954 to pay all but $3,000 of the first year premium of $3 million and prepaid interest on the loans in the amount of $92,407.50, while in 1955 he borrowed the full $3 million and paid interest thereon, as well as on the $2,997,000, and on $82,500 which he had borrowed against an increase in cash surrender value in the total amount of $188,279.83. *In form*, what petitioner did in the first 2 years in which the policies were in force was repeated in succeeding years, with the amounts of loans and interest increasing each year, as set forth in our Findings of Fact. *In form*, petitioner paid Insurance during the years 1954 through 1960 a total of $21 million in premiums and an additional $2,659,950.75 in interest.

When we examine "what was done" *in fact*, we discover that petitioner entered into a transaction with Insurance involving various steps over the years, in each of which years there were various debits and credits made on the books of Insurance, and in which various checks were passed between petitioner and Insurance, but the net effect of which was that during the years 1954 through 1960, petitioner paid to Insurance those net amounts set forth in our Findings of Fact. Petitioner reported adjusted gross income during the years in issue which averaged about $230,000 per year. Although, *in form*, petitioner paid $2,659,950.75 in "interest" and received "supplemental loans" of $1,800,000 during the years 1954 through 1960, "what he was ostensibly 'lent' back was in reality only the rebate of a substantial part of the so-called 'interest' payments. The * * * difference retained by the company was its fee for providing the facade of 'loans'

---

[2] See also *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3, 1959), affirming 31 T.C. 33 and *W. Stuart Emmons*, 31 T.C. 26.

[3] At age 64, petitioner had a life expectancy of 15.6 years. Income Tax Regs., sec. 1.72–9, Table I.

whereby petitioners sought to reduce their * * * taxes * * *."
*Knetsch* v. *United States, supra* at 366.

Over the period of years from 1954 through 1960, petitioner *in fact* established a pattern of "borrowing" all of the "premiums" for the policies and approximately 99 percent of the "increases in cash or loan values." If such a trend continued to the maturity of the policies (the increasing "interest" burden indicates the strong probability of such a course of action), the combined cash value of the 30-year policies would be approximately $340,000, or 0.0362 percent of the indicated cash value of $93,902,420. Monthly payments upon maturity would be about $3,650 instead of the $1,009,451.02 indicated on the face of the policies. On the 20-year policy, the constant borrowing of "premiums" and "increases in cash or loan value" would reduce the face value on maturity to approximately $69,200, or 0.0257 percent of the indicated maturity value of $26,917,830. Similarly, the monthly payments would be about $720, instead of the $279,137.90 stated in the policy. Of course, if conversion of the policies to immediate refund annuities were effected prior to maturity, the payments would be further reduced. While these sums are more substantial than those involved in the *Knetsch* case, *supra*, where the similar percentage was 0.000125, when compared to the large sums ostensibly involved, they are, as the Supreme Court described them, "a relative pittance."

Although petitioner contends that the transaction had the economic substance which the Supreme Court found lacking in the *Knetsch* case, we believe that the two transactions, while different in form, are indistinguishable in principle. Petitioner received no aspect of life insurance by the policies. Neither he nor his beneficiary would receive more than was paid in, plus low-rate interest.[4] There is no persuasive evidence that either the initial policies or any conversion thereof were, or would be, issued at rates more favorable than petitioner might otherwise have secured. Although petitioner contends that the fact that he has "repaid" part of the "loans" gives substance to the transaction, the steps taken in 1957 appear as nothing more than an integrated set of maneuvers by which he successfully managed to get back from Insurance the only portion ($3,000) of the "premiums" which he had ever paid in. In the light of these earlier acts and of its proximity to trial herein, the "repayment" of $3 million 1 week before trial in 1961 is not persuasive of the economic reality of the transactions with Insurance in 1954 and 1955.

---

[4] Although one piece of evidence indicates that the "death proceeds" payable to the beneficiary would exceed amounts paid in, the policy and the records of Insurance clearly indicate that the proceeds upon death during the first year would be only $3,000, not $91,485.91. The difference, which at first blush looks like a life insurance benefit, apparently is nothing more than the return of unused prepaid "interest" on the "loans."

In short, we believe that, as the Supreme Court said in the *Knetsch* case, 364 U.S. 361, 366 (1960), "it is patent that there was nothing of substance to be realized by [petitioner] from this transaction beyond a tax deduction." As this Court said in *W. Stuart Emmons*, 31 T.C. 26, 31–32 (1958), affd. 270 F. 2d 294 (C.A. 3, 1959) :

We might well characterize petitioner's activities here as an operation having no business or annuity or borrowing purpose—a mere device which put on the form of a loan as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to borrow money (or purchase an annuity) but to create a deduction for income tax purposes.

We hold, therefore, that petitioner may not deduct the claimed "interest" payments paid to Insurance during 1954 and 1955. Other issues raised by the petition have been abandoned.

Reviewed by the Court.

*Decision will be entered for the respondent.*

