**ESTATE of Jacob S. KAMBORIAN et al.,**
**Petitioners, Appellants,**

v.

**COMMISSIONER OF INTERNAL REV-**
**ENUE, Respondent, Appellee.**

**No. 72-1248.**

United States Court of Appeals,
First Circuit.

Argued Oct. 2, 1972.

Decided Nov. 14, 1972.

James D. St. Clair, Boston, Mass., with whom Richard L. Levine and Hale & Dorr, Boston, Mass., were on brief, for appellants.

Ernest J. Brown, Atty., Tax Div., Dept. of Justice, with whom Scott P. Crampton, Asst. Atty. Gen., and Meyer Rothwacks, Atty., Tax Div., Dept. of Justice, were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

ALDRICH, Senior Circuit Judge.

Four individuals, hereinafter taxpayers, owned some 76% of the stock of X corporation, and two of them, as trustees for the wife of another, held 50,000 additional shares, or slightly in excess of 13%. Taxpayers individually owned all of the stock of Y corporation. For bona fide business reasons X corporation decided to acquire the Y stock in exchange for 22,871 X shares. The exchange was perfected pursuant to a formal agreement which included, with the wife's consent, the purchase of 418 X shares by the trust.[1] This resulted in increasing taxpayers' combined holdings in X to 77.3%; the trust's interest was reduced to just under 13%, notwithstanding its purchase. However, the combined holdings of taxpayers and the trust remained in excess of 80%, and taxpayers took the position that the transaction was, accordingly, to be viewed as a tax-free exchange. 1954 Int.Rev.Code, §§ 351, 368 (c). The Commissioner disagreed, claiming that the "control" group, or the transaction, see post, was to be limited to taxpayers as the former owners of the Y stock. In refusing to include the trust's purchase the Commissioner relied, in part, upon Regulation 1.351–1(a)(1) (ii).

The Tax Court ruled in favor of the Commissioner, 56 T.C. No. 66 (1971), and taxpayers seek review. Basically, they make a frontal attack on the regulation, urging us to hold it invalid as going beyond what they claim is a plain and positive statute.[2]

We start with the general proposition expressed in section 1002 of the Code,

"Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized."

Section 351 provides,

"Transfer To Corporation Controlled By Transferor.

"(a) *General Rule.*—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation."

"Control" is defined in section 368(c) as the possession of 80% of the stock of the transferee corporation.

Taxpayers' brief contains a wistful aside that there is involved a large tax and only a small discrepancy. We are

---

1. The trust paid $5,016, or $12 a share. On this basis the shares acquired by taxpayers were worth $274,452. The Tax Court found they were worth slightly more.

2. Alternatively, taxpayers argue that even if the regulation is valid, the Tax Court erred in applying it to their transaction. This claim is patently erroneous. After a review of the record it is clear that the Tax Court's findings were not only reasonably supported, but manifestly correct.

not moved, legally or emotionally, by this fact. But in order to avoid any overfall therefrom, we will imagine another case that would have to be decided against the government if taxpayers are correct and all arranged transactions, regardless of their purpose or their connection with one another, are to be viewed as a single exchange. Let us suppose that P owns 10% and S 90% of the stock of W, and P owns all of the stock of Z. If P transfers his Z stock to W for further W shares, ending up with a 30% interest, it is obviously not a tax-free exchange. But if P induces S to buy, contemporaneously, one share of W stock for cash the present petitioners would say that P and S are to be considered jointly as exchanging property, and since together they owned over 80% of the transferee corporation, P may claim the statutory exception.

■■ Our analysis does not lead to such a result. By the term "property [that] is transferred," the statute contemplates a single transaction, even though, as it goes on to recognize, there may be a number of transferors or participants. What is a transaction must be determined in the light of the statutory purpose, lest taxpayers be allowed to frustrate that purpose by manipulation of clearly taxable exchanges. *Cf.* Knetsch v. United States, 1960, 364 U.S. 361, 365–366, 81 S.Ct. 132, 5 L.Ed.2d 128; Goldstein v. Commissioner, 2 Cir., 1966, 364 F.2d 734, 740–742, cert. denied 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543. We stated that purpose long ago in speaking of the predecessor of section 351, which contains no presently material variance.

"It is the purpose of Section 112(b) (5) to save the taxpayer from an immediate recognition of a gain, or to intermit the claim of a loss, in certain transactions where gain or loss may have accrued in a constitutional sense, but where in a popular and economic sense there has been a mere change in the form of ownership and the taxpayer has not really 'cashed in'

on the theoretical gain, or closed out a losing venture."
Portland Oil Co. v. Commissioner, 1 Cir., 1940, 109 F.2d 479, 488, cert. denied 310 U.S. 650, 60 S.Ct. 1100, 84 L.Ed. 1416.

Thus in our hypothetical, considering P alone, there was not a "mere change in the form of ownership." Before the transaction P "owned" Z corporation, since he owned 100% of its stock. After the transaction his ownership of Z was reduced to 30% because he held only a 30% interest in W, the transferee corporation. In keeping with "economic sense" a taxpayer may be allowed a certain amount of slack. This has been ruled to be 20%; and had P ended with an 80% interest in W, and thus of Z, his ownership of the latter would not be thought to be materially changed. 1954 Int.Rev.Code § 368(c). But where P does not own that 80% it can be permissible to consider transfers by other owners only if those transfers were, in economic terms, sufficiently related to P's to make all of the transfers parts of a single transaction.

It is possible that a valid association may exist even when different types of property are transferred to the transferee corporation by different transferors. Thus in Halliburton v. Commissioner, 9 Cir., 1935, 78 F.2d 265, funds contributed by other parties were found to be as necessary to the overall purpose of the transaction as was the exchange by the litigating taxpayers. In our P and S case, however, there is no economic connection, and hence no basis for regarding the two transfers as parts of one transaction, and hence of considering P and S as a unit in terms of control. If a taxpayer were able, so simply, to effect a concatenation and say that the statute applied to him, the statute would be meaningless.

■ The instant case presents no better claim of a connection in an economic sense. The four shareholders of Y decided it would be advantageous to merge Y with X. Finding themselves short of the requirements for tax-free

**222**

treatment, they persuaded a shareholder of X, who was a complete stranger to Y, to make a token purchase of X shares. Other than the fact that the trust's participation was incorporated into the acquisition agreement, there was no relation between the exchange of Y shares and this very minor purchase. The trust transferred no Y shares. The cash it contributed to X—$5,000 for 418 shares of a corporation with nearly 400,000 shares outstanding—could have had no significant impact on X's ability to conduct its business. The trustees' desire to help the Y stockholders avoid taxes, warrantably found by the Tax Court to have been the primary motive for the trust's purchase,[3] cannot be used to make a single transaction out of otherwise unrelated transfers.

 Without going into every ramification of the Regulation, in this case it appropriately and fairly fits our interpretation of the statute. Taxpayers' criticisms of the Tax Court's opinion in this regard are not readily persuasive. However, if, in some fashion, taxpayers could remove the Regulation from consideration or application altogether, it would avail them nothing.

As a separate issue, one of the taxpayers, hereafter father, seeks to overturn a disallowance of a bad debt, or loss, admittedly incurred by himself or his son, upon the failure of another, unrelated company. The sole question is, whose was the loss.

The facts are these. Son wished to help finance a company in which he was interested. Father advanced the money, son gave it to the company (in what form does not appear) and the company thereafter failed. Father testified that son was his agent to make the investment, and argues in this court that the Tax Court's finding against him was clearly erroneous. We do not consider, however, that the Tax Court's finding

that the money had been a gift to son was unsupported by warrantable inferences. Father points to the fact that on other occasions he lent son money, and received a note, as confirming, by the absence of one here, that son was to invest in the company in father's behalf. One could draw the opposite inference; that the absence of a note indicated that son was not to be obliged to account. Indeed, it would seem so easy for father to have dealt with the company directly, if the interest was to be his, that the attack on the Tax Court's finding seems quite uncalled for. Had the company prospered, one may readily imagine that father would not have been the one to report the income.

Affirmed.

---

3. The court's use of "primary motive" was to coincide with the language of the Regulation. On the basis of its findings it seems apparent that it was the sole motive. The only effect we can see from the point of view of the trust was to reduce its income.