**GEORGETOWNE SOUND, et al.**

v.

**UNITED STATES of America.**

Civ. No. Y–91–3104.

United States District Court,
D. Maryland.

May 4, 1993.

George Christian, Jr., pro se.

Robert A. Angueira, U.S. Dept. of Justice, Washington, DC, for defendant.

### MEMORANDUM

JOSEPH H. YOUNG, Senior District Judge.

George Christian, Jr. (Petitioner), appearing *pro se*, challenges the Government's 1983–1984 Final Partnership Administrative Adjustment (FPAA) for an investment made by Petitioner's business and bears the burden of showing that the Government's determinations were erroneous. *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933). Since Petitioners were motivated solely by tax benefits and the transaction offered no reasonable possibility of profit, the Government properly disallowed all losses, deductions, expenses, and tax credits taken in the transaction.

I

In December 1983, Petitioners and other participants (lessees) signed an agreement with Auravision Corp. (Auravision), entitled "Tenants In Common In An Equipment Lease" (TIC). Petitioner Christian seeks relief on behalf of himself, Marion E. Christian, and Georgetowne Sound. The purpose of the TIC was to invest in a master recording album, the "Billy Meisner 'Nightfire' L.P." Master recordings are permanent tapes of musical performances used to make records and tapes for mass distribution and sale. The lessees were permitted to engage dis-

tributors to manufacture, sell, and distribute records and tapes derived from the master, and the lessees employed Georgetowne Sound for that function. Under the TIC, all profits, losses, rents and other costs incurred relating to the management of the master recording were shared by the lessees in proportion to their interest. Management decisions were jointly made by the lessees, and the lessees' interest in the master recording were not freely transferable.

Georgetowne Sound had a 10% interest in the TIC, which it acquired with $9,000 in cash and a promissory note for $21,000. The master recording album was assigned a value of $7,350,000, and Georgetowne Sound was allocated a $735,000 interest (10% of $7,350,-000). Thus, Georgetowne Sound gained an interest allegedly worth $735,000 for $9,000 in cash.

In 1987, the Internal Revenue Service (IRS) issued notices of deficiencies to some of the investors in the Billy Meisner TIC, including Petitioner and his wife, Marion E. Christian, and George and Laura Christian, Sr., Petitioner's parents. On November 2, 1987, Petitioner sought a Redetermination of Tax Deficiencies for the years 1979 through 1984 with the Tax Court. On October 9, 1992, the Tax Court issued an Order stating that no evidence had been presented to suggest that the TIC was not a partnership. The Tax Court's decision was based on an earlier ruling against Petitioner's parents, holding that the TIC was a partnership.

On June 3, 1991, the IRS issued an FPAA which covered tax years 1983 and 1984. The FPAA classified the TIC as a partnership for federal tax purposes and all losses, deductions, expenses, and income tax credits associated with the Billy Meisner TIC were disallowed. On October 29, 1991, Petitioner filed this "Petition for Readjustment of the 1984 FPAA", seeking a determination that the Billy Meisner master recording lease was not a partnership for federal income tax purposes.

On April 7, 1992, the IRS filed a Motion to Dismiss the Petition for lack of jurisdiction under 26 U.S.C. § 6226(e)(1), which requires a jurisdictional deposit equalling the amount of tax deficiency. The Court found that since Petitioner was contesting only the 1984 FPAA, he need only pay the 1984 assessed deficiency, which Petitioner paid. However, Petitioner contests the FPAA for both 1983 and 1984, but argues that since he never received the 1983 FPAA, his 1983 tax return is not being challenged. In a three-day, non-jury trial, the parties introduced evidence on whether or not the Billy Meisner TIC was a sham and a tax shelter, properly characterized as a partnership for tax purposes.

## II

█ If the Billy Meisner TIC had no economic substance other than the creation of income tax losses, the transaction should be disregarded for tax purposes. *Knetsch v. United States*, 364 U.S. 361, 366, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960); *Gregory v. Helvering*, 293 U.S. 465, 469–470, 55 S.Ct. 266, 267–268, 79 L.Ed. 596 (1935); *Hunt v. C.I.R.*, 938 F.2d 466 (4th Cir.1991); *Rice's Toyota World, Inc. v. C.I.R.*, 752 F.2d 89 (4th Cir.1985).

█ In *Rice's Toyota*, the Fourth Circuit promulgated a two-part test to determine whether a transaction constitutes an economic sham: whether the taxpayer was motivated by no business purpose other than obtaining tax benefits and whether the transaction lacks economic substance because no reasonable possibility of profit exists. 752 F.2d at 91–92 (citations omitted). In *Hunt*, the Fourth Circuit determined that investments in master recording tapes similar to the TIC here were a sham. 938 F.2d at 472.

To determine the business purposes of a taxpayer participating in a transaction, the *Hunt* court considered the focus of the promotional materials distributed to investors, which emphasized the tax benefits of the lease program. 938 F.2d at 472. In discussing the deal's economic substance, the court noted the participants' investment activity before and after the investment, Petitioner's experience, the overevaluation of the master recordings, and the fact that virtually all of the consideration paid by the purchaser of the master recording was deferred until the hypothetical sale of the recordings. 938 F.2d at 472.

As was the case in *Hunt,* the promotional materials for Auravision focus on tax benefits to the lessees. Auravision leased interests in many different master recordings, promoting the investments with general, positive forecasts for the record industry, and charts detailing investors' opportunity to take tax credits and deductions in excess of their total cash payment (Dft. Exbts. 5, 6, & 7). Except for the testimony of Petitioner, no evidence was offered to show that Georgetowne Sound invested in the Billy Meisner recording because Billy Meisner was a promising artist, or for any reason apart from tax benefits. Thus, the business purpose prong of the sham transaction test is satisfied.

If, apart from tax benefits, the lease program afforded Georgetowne Sound no reasonable possibility of profit, then the transaction had no economic substance. *Hunt,* 938 F.2d at 471. As in *Hunt,* the transaction's economic substance should be analyzed by considering Petitioner's investment activity, Petitioner's experience with master music recordings, the value placed on the master by Georgetowne Sound and Auravision, and whether the structure of the purchase was economically realistic. 938 F.2d at 472.

As for investment activity and experience, Petitioner did not receive a cassette and biography of Billy Meisner until December 14, 1983, two weeks before he signed the lease agreement with Auravision. Furthermore, apart from some contacts with Quicksilver Records, Inc., a music distributor, Georgetowne Sound did little to develop its interest in Billy Meisner prior to the IRS' March 6, 1985 notification that the master recording lease tax deductions would not be allowed (Plf. Exbt. 136C). Finally, although Petitioner is an experienced cameraman for CBS, he has no experience in the competitive music industry.

Likewise, the value Georgetowne Sound placed on the Billy Meisner master, $7,350,-000, bore no relationship to the total price paid by all the lessees ($300,000) or the IRS appraiser's determination of the fair market value ($3,000). (Dft. Exbt. 13, p. 11). The IRS appraiser, John Wiedenmann (Wiedenmann), a music industry consultant and expert, offered convincing testimony that the Billy Meisner master recording was greatly overvalued, finding that the artist is unknown in the United States, a disadvantage in selling records, and that Georgetowne Sound designed an album cover that was not conducive to selling an unknown artist, since it did not picture the artist, indicate whether the album was vocal or instrumental, or even show the style of music performed. The album itself is of poor quality, according to Wiedenmann, and is only recorded on two tracks (Plf. Exbt. 96I), instead of the standard 16 or 24. Moreover, Georgetowne Sound produced a 45 record of a single Billy Meisner song, but that song is not one of those included on the "Nightfire" album. Finally, Billy Meisner's name is spelled "Misener" on the 45 record. In short, Wiedenmann concluded that recordings like the Billy Meisner master "do not generate enough income to justify the recording expense." (Dft. Exbt. 13, p. 11). Rather, the inflated value of the recording allowed Petitioner to take a larger investment tax credit. The lessees would have to sell more than 12 million albums to recoup an investment of $7 million, and Georgetowne Sound would have to sell 50,000 albums to recoup its $30,000 investment.

Petitioner concedes that Georgetowne Sound never had the Billy Meisner master recording independently appraised, but instead relied on the value claimed by Auravision, from whom the master recording was leased. Petitioner did not call an expert to testify to the value of the recording, merely pointing out that the valuation of master recordings was highly subjective, and that industry experts make mistakes. Even allowing for differences of opinion about the Billy Meisner master recording, Wiedenmann offered several reasons for the low estimate. Petitioner, who has no master recording experience himself, and who received enormous tax benefits from a high valuation, did not attempt to secure an independent appraisal, and did not respond to Wiedenmann's specific bases for the $3,000 valuation.

Finally, since Petitioner did not negotiate the cash payment made by Georgetowne Sound, and paid the majority of the obli-

gation with a promissory note, the transaction lacks commercial plausibility. Petitioner offered no evidence to counter the Government's contention that Georgetowne Sound did not negotiate the $9,000 cash price it paid for the Billy Meisner master recording. Petitioner apparently did negotiate the interest rate on the $21,000 promissory note, from 18.5% to 9% (Plf. Exbt. 131), but the amount of deferred debt in the purchase renders the transaction commercially implausible. In short, according to Wiedenmann's report, "it is difficult to understand why anyone doing a minimum amount of research, would have any desire to enter into an agreement to lease these type of recordings. It would be extremely difficult to even anticipate realizing a profit from this type of venture." (Dft. Exbt. 13, p. 21). Moreover, Wiedenmann testified that unknown artists rarely achieve success with the first album, and that record companies invest sums at the beginning of an artist's career in the hope that, years and albums later, the investment will pay off. In the case of Billy Meisner, Georgetowne Sound merely leased the master recording for eight years, so the possibility of profit was further diminished.

Petitioner did engage in some activity to market the Billy Meisner recording. He placed an advertisement for "Nightfire" in *Billboard Magazine* (Plf. Exbt. 161), inquired about producing a Billy Meisner video (Plf. Exbt. 42E), and hired Quicksilver Records to distribute the album (Plf. Exbt. 97). However, the album was not even produced until May 1985 (Plf. Exbt. 96J), two years after the lease was signed, and Petitioner deducted 100% of the distribution costs. The record indicates that not a single album was sold. Thus, given Petitioner's lack of zeal in promoting Billy Meisner, lack of experience with master recordings, the overevaluation of the Billy Meisner master recording, and the deferral of payment for it, the economic substance prong of the sham transaction test is satisfied. The Court finds that this master recording investment is a sham transaction to be disregarded for tax purposes. The Government's characterization of the TIC as a partnership is proper.

■ Petitioner also protests that his father attempted on two occasions to get a ruling from the IRS that Auravision leases were not tax shelters. However, Petitioner submitted a letter, dated September 13, 1982, which is alleged to be his father's recollection of what was requested of the IRS and when (Plf. Exbt. 135). The alleged first letter received no response. Petitioner offered a second letter requesting a ruling, dated November 17, 1983 (Plf. Exbt. 136A). Petitioner's father testified that the IRS answered by informing him of the proper procedure for obtaining such a ruling, but neither Petitioner nor his father followed through with the request. They invested with Auravision, in spite of knowledge that the company was undergoing long-term investigations by the IRS and Securities and Exchange Commission (SEC).

■ The Government also contends that the Billy Meisner TIC was a generic tax shelter lacking economic substance. The characteristics suggestive of a master recording lease tax shelter are as follows:

(1) Tax benefits are focus of promotional materials;

(2) Investors accept terms of purchase without price negotiation;

(3) Assets consist of purported rights, difficult to value and substantially overvalued in relation to tangible property included as part of the package;

(4) Tangible assets were acquired or created at a relatively small cost shortly prior to the transaction; and

(5) Bulk of consideration was deferred by promissory notes, nonrecourse in form or substance.

*Hester v. Commissioner,* 64 TCM 802 at 804–805, filed September 21, 1992 (citations omitted). As stated above, the Government contends that the TIC exhibited most if not all of the listed characteristics. All of these factors were discussed in analyzing whether the TIC was a sham transaction and the Court likewise finds that the Billy Meisner TIC was a generic tax shelter.

The findings of facts and conclusions of law are set forth herein in accordance with the provisions of F.R.Civ.P. 52(a).

*ORDER*

In accordance with the attached Memorandum, it is this 4th day of May, 1993, by the United States District Court for the District of Maryland, ORDERED:

1. That the Petition for Readjustment of the 1984 FPAA BE, and the same IS, hereby DENIED;

2. That the Internal Revenue Service's 1983–1984 FPAA BE, and the same IS, hereby affirmed;

3. That the Internal Revenue Service be allowed to continue its assessment and collection actions against Petitioners; and

4. That copies of this Memorandum and Order be mailed to the parties.