105 F.3d 1085
 BAKAL BROTHERS, INC. d/b/a 7-Van Drugs, a Michigan
corporation, Plaintiff-Appellant,
v.
UNITED STATES of America, United States Department of
Agriculture, Food and Consumer Service, Defendant-Appellee.
 No. 95-2163.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 14, 1996.
Decided Jan. 30, 1997.
 
 Lawrence S. Gadd (briefed), Alan C. Harnisch (argued and briefed), Harnisch & Associates, Bingham Farms, MI, for plaintiff-appellant.
 Christopher P. Yates (argued and briefed), Office of the U.S. Attorney, Detroit, MI, for defendant-appellee.
 James C. Zeman (briefed), Bellance, Beattie, Harper Woods, MI, for amicus curiae Associated Food Dealers of Michigan, Inc.
 Before: KENNEDY and BATCHELDER, Circuit Judges; EDGAR*, District Judge.
 KENNEDY, Circuit Judge.
 
 
 1
 Plaintiff Bakal Brothers, Inc. ("Bakal Brothers") appeals a District Court order affirming a decision of the United States Department of Agriculture, Food and Consumer Service ("FCS"), permanently disqualifying plaintiff from the federal food stamp program. We agree with the District Court that FCS acted within its authority and shall AFFIRM.
 
 I. Background
 
 2
 Bakal Brothers owns and operates 7-Van Drugs, a Detroit convenience and drug store. In November 1994, Bakal Brothers hired Saimir Jamel, the 17 year-old nephew of the store's co-owners, to work part-time at 7-Van Drugs. Jamel's duties included sweeping the floor and parking lot, stocking cigarettes, cleaning the counter, and other similar tasks. He did not operate the cash register or wait on customers.
 
 
 3
 Based upon a tip from a confidential informant that there was trafficking in food stamps at 7-Van Drugs, an undercover officer from the Michigan State Police entered the store on December 12, 1994 and sought to sell food stamps. He first approached Eddie Bakal, a co-owner of the store who was working behind one of the cash registers, and offered to sell food stamps for cash. When Bakal rejected the offer, the officer approached an employee working at a different cash register and offered to sell food stamps. The employee also rejected the officer's offer and told him to leave the store.
 
 
 4
 As the officer was leaving, Jamel, who had witnessed the rejected food stamp transactions, followed him into the parking lot and offered to purchase food stamps. The officer then sold Jamel $270 in food stamps for $150 in cash. Jamel indicated that he would be willing to purchase more food stamps in the future, and he gave the officer his pager number.
 
 
 5
 On January 4, 1995, the officer contacted Jamel using the pager number provided by Jamel. The two arranged a meeting at the store to make another food stamp sale. When the officer arrived at the store, Jamel took him outside the store and purchased $295 in food stamps for $170 in cash. A third transaction took place on January 11, 1995. After contacting Jamel by pager, the officer met Jamel in the parking lot outside 7-Van Drugs. Jamel purchased $500 in food stamps for $300 in cash. Jamel was arrested immediately following the transaction.
 
 
 6
 In all three of the illegal transactions, Jamel used his own money to purchase the food stamps. He used the stamps to purchase groceries for himself at a large supermarket. Jamel testified that neither Jacob Bakal nor Eddie Bakal, the co-owners of the store, knew of his food stamp purchases. Jamel ultimately pleaded guilty in Detroit Recorder's Court to exchanging cash for food stamps.
 
 
 7
 On March 1, 1995, FCS notified Bakal Brothers that it was considering disqualifying the store from the food stamp program because of food stamp trafficking at the store. By letter dated May 9, 1995, FCS notified Bakal Brothers that the agency had permanently disqualified Bakal Brothers from participation in the food stamp program. Bakal Brothers appealed to the FCS Administrative Review Branch, which subsequently upheld the administrative ruling. On August 3, 1995, Bakal Brothers filed a complaint in the U.S. District Court for the Eastern District of Michigan seeking judicial review of the agency's action. After a de novo bench trial in September 1995, the District Court sustained the sanction against Bakal Brothers. Bakal Brothers timely appealed to this Court.II. Discussion
 
 
 8
 Bakal Brothers claims that the District Court erred in affirming its disqualification from the federal food stamp program. Bakal Brothers contends that under the circumstances of this case, it should not be responsible for the illegal actions taken by Jamel. Our task on appellate review is to determine whether FCS "acted within its authority in permanently disqualifying [plaintiff] from the food stamp program." Goldstein v. United States, 9 F.3d 521, 523 (6th Cir.1993).
 
 
 9
 Under 7 U.S.C. § 2021(b), a retail food store shall be subject to sanctions if the store has engaged in the "trafficking" of food stamps. 7 U.S.C. § 2021(b)(3)(B). Trafficking in food stamps is defined as the "buying or selling" of coupons "for cash or consideration other than eligible food." 7 C.F.R. § 271.2 (1996). A store is responsible for the trafficking of food stamps by "[p]ersonnel of the firm." 7 C.F.R. § 278.6(e)(1)(i)(1996).
 
 
 10
 Prior to 1988, 7 U.S.C. § 2021(b) provided for mandatory permanent disqualification from the food stamp program for the first trafficking violation. Congress amended § 2021(b) in 1988 to give the Secretary of Agriculture the discretion to impose a civil money penalty rather than permanent disqualification for a trafficking violation. The amended statute provides that a store shall be permanently disqualified upon:
 
 
 11
 the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store or wholesale food concern, except that the Secretary shall have the discretion to impose a civil money penalty of up to $20,000 for each violation ... in lieu of disqualification under this subparagraph, for such purchase of coupons or trafficking in coupons or cards that constitutes a violation of the provisions of this chapter or the regulations issued pursuant to this chapter, if the Secretary determines that there is substantial evidence (including evidence that neither the ownership nor management of the store or food concern was aware of, approved, benefited from, or was involved in the conduct or approval of the violation) that such store or food concern had an effective policy and program in effect to prevent violations of the chapter and the regulations [.]
 
 
 12
 7 U.S.C. § 2021(b)(3)(B) (emphasis added).[1] This provision clearly permits FCS to impose a sanction--either permanent disqualification or a civil money penalty--on an "innocent" store owner for trafficking by employees. See Goldstein, 9 F.3d at 524 (holding that innocent owner could be permanently disqualified from food stamp program); see also TRM, Inc. v. United States, 52 F.3d 941, 945 (11th Cir.1995) ("We conclude that Congress would not have provided a [civil money penalty] as an alternative to permanent disqualification for innocent owners had it not felt that innocent owners could be disqualified under the Food Stamp Act."); Freedman v. United States Dep't of Agriculture, 926 F.2d 252, 259 (3d Cir.1991) ("The fact that the civil money penalty was to be imposed only if it is determined that a store owner had an effective policy to prevent violations clearly indicates that Congress intended 'innocent' store owners be subject to the penalties authorized by section 2021(b) of the Food Stamp Act as amended in 1988.").
 
 
 13
 Under the amendment to § 2021(b), a store is responsible for illegal trafficking by employees even if there is evidence that neither the owner nor manager of the store "was aware of, approved, benefited from, or was involved in the conduct or approval of the violation." 7 U.S.C. § 2021(b)(3)(B). The innocence of the store owner is relevant only to determine which sanction shall be imposed--a civil penalty or disqualification--not whether a sanction shall be imposed. The Secretary of Agriculture may reduce the sanction for trafficking from permanent disqualification to a money penalty, provided that the owner can show that it had established an effective policy and program to prevent trafficking. 7 U.S.C. § 2021(b)(3)(B). The determination of the appropriate sanction is left to the discretion of the Secretary. Id. We have held that this determination is not open to judicial review. See Goldstein, 9 F.3d at 524.
 
 
 14
 Having concluded that § 2021(b) permits the permanent disqualification of an innocent owner from the food stamp program, we must next decide whether Bakal Brothers is responsible for the illegal trafficking by Jamel. Bakal Brothers concedes that Jamel engaged in food stamp trafficking, but asserts that, under the circumstances of this case, Jamel's conduct should not be imputed to the store.
 
 
 15
 The applicable regulations provide that a store is responsible for trafficking by "personnel of the firm." 7 C.F.R. 278.6(e)(1)(i) (1996).[2] Because "personnel" is not defined in the regulations or the statute, the ordinary meaning of the word governs. See United States v. Edge, 989 F.2d 871, 878 (6th Cir.1993) (per curiam). "Personnel" is "a body of persons employed in some service" or "a body of employees that is a factor in business administration." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1687 (1971).
 
 
 16
 Bakal Brothers contends that when Jamel engaged in the illegal transactions, he was acting in his capacity as an individual, not in his capacity as "personnel of the firm." Bakal Brothers asserts that it should not be liable for trafficking by an employee in a non-management position who did not use the store as a conduit to engage in trafficking and who acted outside the scope of his actual or apparent authority. We do not agree.
 
 
 17
 On each of the three occasions when Jamel engaged in trafficking, the transaction took place in the parking lot of the store while Jamel was on duty. The fact that the trafficking took place in the parking lot does not relieve the store of responsibility for the transactions. Jamel first saw the officer while both were inside the store, and he followed the officer into the parking lot in order to purchase the food stamps. The parking lot was, under the circumstances, an extension of the store. Indeed, Jamel's job duties included sweeping the parking lot.
 
 
 18
 Bakal Brothers makes much of the fact that Jamel was acting outside his actual or apparent authority when he engaged in trafficking. Bakal Brothers contends that it should be insulated from Jamel's trafficking because Jamel was a 17-year-old stock boy who was not authorized to accept food stamps on behalf of the store. We do not believe that an employee must be authorized to accept food stamps in order to hold the store responsible for the employee's trafficking. The regulations provide that the store shall be sanctioned if "personnel of the firm" have trafficked in food stamps. Nothing in the statute or the regulations indicates that "personnel" is limited to those employees authorized to accept food stamps.
 
 
 19
 The regulations provide that, in order to be eligible for a civil money penalty, the store must have implemented an effective program to train "all managers and employees whose work brings them into contact with food stamps or who are assigned to a location where food stamps are accepted, handled or processed." 7 C.F.R. § 278.6(i)(2)(i)(1996). This would appear to make a store responsible for the conduct of all employees who work where food stamps are accepted. Because Jamel falls into this category, Bakal Brothers can be sanctioned for Jamel's trafficking.
 
 
 20
 The House Committee Report states, moreover, that the amended § 2021(b)'s provision of a civil money penalty as an alternative to permanent disqualification reflects the view that stores with an effective policy to prevent trafficking "should not be presumptively disqualified from participation in the Food Stamp Program due to the unauthorized or expressly prohibited acts of store personnel." H.R.REP. NO. 100-828, pt. 1, at 28 (1988) (emphasis added). Congress, thus, envisioned that stores would be sanctioned (either with disqualification or a fine) for unauthorized conduct by employees.
 
 
 21
 Although we sympathize with plaintiff's position, Congress has made clear that innocent store owners should be held responsible for the independent, unauthorized acts of store personnel. We note that plaintiff could have requested that FCS consider imposing a civil money penalty in lieu of permanent disqualification. 7 C.F.R. § 278.6(b) (1996). Such a request must be submitted, along with supporting evidence that the store had an effective policy and program to prevent trafficking, within ten days after the store has received a "charge letter" indicating that FCS is considering disqualification. 7 C.F.R. § 278.6(b)(2) (1996). In the absence of a request for a civil money penalty and supporting documentation, a store "shall not be eligible for such a penalty." 7 C.F.R. § 278.6(b)(2)(iii)(1996). Bakal Brothers chose not to seek a civil money penalty. As a result, FCS was required to impose permanent disqualification.
 
 
 22
 An argument is advanced by an amicus curiae brief that holding food stamp vendors strictly liable for the unauthorized trafficking of their employees violates substantive due process under the Fourteenth Amendment. Because the argument was not raised by plaintiff, we are not required to pass upon the claim. See Knetsch v. United States, 364 U.S. 361, 370, 81 S.Ct. 132, 137, 5 L.Ed.2d 128 (1960) (declining to address argument presented only by amicus curiae ). We note, however, that the Eleventh Circuit recently considered the issue and held that the imposition of strict liability upon innocent store owners does not violate the owner's substantive due process rights. See TRM, 52 F.3d at 944-47.
 
 III. Conclusion
 
 23
 For the foregoing reasons, we AFFIRM the judgment of the District Court.
 
 
 
 *
 The Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 The parenthetical directing the Secretary to consider certain evidence was added in 1990. The 1990 amendment also changed the maximum available civil money penalty. Food, Agriculture, Conservation, and Trade Act of 1990, Pub.L. No. 101-624, § 1743, 104 Stat. 3359, 3795 (1990)
 
 
 [2]
 The regulation provides: "The FCS regional office shall: (1) Disqualify a firm permanently if: (i) Personnel of the firm have trafficked as defined in § 271.2 ..." 7 C.F.R. 278.6(e)(1) (1996). This regulation was written before the 1988 amendment to 7 U.S.C. § 2021(b). As already indicated, the amended statute makes clear that permanent disqualification is no longer required, provided that the firm can establish that it had an effective policy and program in effect to prevent violations and that the owners and managers were not involved