MILTON FRANK AND JOSEPHINE FRANK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MILTON FRANK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Frank v. Commissioner
Docket Nos. 1856-78, 1857-78.
United States Tax Court
T.C. Memo 1982-214; 1982 Tax Ct. Memo LEXIS 537; 43 T.C.M. (CCH) 1149; T.C.M. (RIA) 82214; April 21, 1982. Murray Appleman, for the petitioners. Vincent R. Barrella and Michael K. Phalin, for the respondent. WHITAKER
MEMORANDUM FINDINGS *538 OF FACT AND OPINION WHITAKER, Judge:* Respondent determined the following deficiencies in Federal income tax and additions to the tax for the years 1970 through 1973 against petitioner Milton Frank: Additions to Tax
Year
Deficiency
Sec. 6651(a) [1]
Sec. 6653(a)
1970
$ 37,619.39
$ 9,457.75
$ 1,891.55
1971
12,337.19
3,084.30
690.55
1972
17,026.33
4,256.58
987.95
1973
10,761.40
2,695.75
539.15
For the years 1974 and 1975, respondent determined the following income tax deficiencies and additions to the tax against petitioners Milton Frank and Josephine Frank: Additions to Tax
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
1974
$ 26,322.60
$ 5,020.36
$ 1,430.00
1975
6,049.37
604.93
752.25
After concessions, *539 the issues to be decided are: (1) Did petitioner Milton Frank receive unreported income from Frank's Service Station in each of the years in issue, and if so, did respondent correctly compute the amounts of unreported income by use of the percentage markup method? (2) Are the returns for 1970 through 1973 joint returns even though not signed by Josephine Frank? (3) If these returns are not joint returns, was Mr. Frank entitled to claim a personal exemption for Mrs. Frank? (4) Are petitioners liable for the additions to the tax under sections 6651(a) and 6653(a)? FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of the facts and exhibits attached thereto are incorporated herein by reference. The petition in docket No. 1857-78 relates to the years 1970, 1971, 1972 and 1973, and was filed by Milton Frank. The petition in docket No. 1856-78 relates to the years 1974 and 1975, and was filed by Milton Frank and Josephine Frank, husband and wife. When these petitions were filed, petitioners resided in Staten Island, New York. Income tax returns for the years 1970 through 1973 were filed on December 4, 1974, December 16, 1974, January 6, 1975, and *540 February 27, 1975, respectively. Each of these returns was signed only by Mr. Frank as taxpayer, and by Brian Bergman as return preparer. However, on each of these returns the box indicating "Married filing jointly" was checked, Mrs. Frank's social security number and her occupation (housewife) were listed, and Mrs. Frank was claimed as a personal exemption. Joint income tax returns for 1974 and 1975 were filed by the Franks on August 7, 1975, and November 24, 1976, respectively. Petitioners were granted an extension of time for filing their 1974 return to June 15, 1975. From 1970 through 1975 interest income, which was reported on the returns, was earned on a joint savings account in the names of Milton Frank and Josephine Frank at the Community National Bank and Trust Company of Richmond. Mrs. Frank was a housewife during the years in issue. She took no part in her husband's business or financial activities. She was not even aware of the joint savings account. She had no other sources of income and received from her husband approximately $ 75 each week to cover household and other expenses. During the years in issue, Mr. Frank operated Frank's Service Station (hereinafter *541 referred to as the service station), located at 81-85 Columbia Street, Brooklyn, New York, as a sole proprietorship. Because Columbia Street was a heavily traveled alternate route to the Brooklyn-Queens Expressway, especially during rush hours, the station was well located to attract business. The service station sold gasoline and oil and other lubricants, and performed minor automotive repair work and New York State automobile safety inspections. Mr. Frank also operated a parking lot on an adjacent parcel of land located at 85 Columbia Street, Brooklyn, New York. Mr. Frank operated both the service station and the parking lot primarily through cash transactions. He did not own a cash register and maintained no adding machine tapes, daily logs or other contemporaneous written records from which the receipts could be verified and allocated between the businesses of the service station and parking lot. Cash was simply kept by Mr. Frank in his pocket until he periodically made deposits in his bank account. The few original records that were retained, such as bills and bank statements, were generally kept in boxes or shopping bags and were in no particular order. From the few *542 records he had, it was not possible to accurately compute gross receipts or to determine what portion of receipts were attributable to particular aspects of the business. Prior to 1970, Mr. Frank's tax returns had been prepared by Irving Roggen. From Mr. Roggen's death in 1970 to some date in 1973, when Mr. Frank employed Brian Bergman, there was no accountant and no income tax returns were filed. After Mr. Bergman was retained, Mr. Frank gave him the records he had with respect to 1970 through 1973, principally a checkbook, bank statements, and miscellaneous bills. Mr. Bergman also obtained some files from the prior accountant, including some ledgers kept by that accountant. Based on these records and oral statements of Mr. Frank, Mr. Bergman reconstructed the gross receipts and expenses of the service station and parking lot. In so doing, Mr. Bergman relied upon Mr. Frank's statements that all receipts were deposited in the bank account daily [2] and that $ 175 per week was withdrawn for personal expenses. Mr. Bergman continued ledgers started by his predecessor, which petitioners contend constitute the original books and records. However, these ledgers were no more accurate *543 than the fragmentary records furnished to the accountant. Mr. Bergman made no attempt to verify facts from other available sources other than to obtain duplicate bank statements to replace those which were missing. In this manner, Mr. Bergman prepared the income tax returns for 1970 through 1973. During 1974 and 1975, Mr. Bergman obtained similar records about every three months. From this information he continued to make entries in the ledgers and from those books prepared the tax returns for 1974 and 1975. There is no evidence of any effort by the accountant during 1974 or 1975 to segregate receipts and disbursements between the various aspects of Mr. Frank's sole proprietorship or to persuade Mr. Frank to keep adequate original records of his cash transactions. Petitioners did not keep permanent books of account or records sufficient to establish with the required accuracy the amount of gross income and deductions of the sole proprietorship. In auditing petitioners' returns for the years 1970 through 1975, respondent obtained from the supplier, *544 Gulf Oil Company, records showing the quantities and cost of gasoline, oil and other lubricants purchased for resale by the service station as follows: Oil and Other
Gasoline
Gasoline
Lubricants -
Year
Gallons
Cost
Cost
1970
1,022,343
$ 317,390
$ 3,546
1971
666,436
137,925
1,004
1972
698,870
144,196
1,382
1973
760,734
163,318
2,190
1974
620,195
192,175
2,936
1975
440,220
160,512
3,900
It is stipulated that the service station also made the following payments for labor and for automotive parts for resale to customers: Year
Labor
Automotive Parts
1970
$ 28,340
$ 16,421
1971
16,619
19,500
1972
14,365
21,701
1973
14,365
17,969
1974
14,365
59,484
1975
14,365
52,644
The sums of the amounts listed above for the purchases of gasoline, oil, other lubricants, and automotive parts in each year differed substantially from the amounts of purchases reported on the returns. These differences were as follows: Purchases, per
Purchases, per
Gulf Oil records
Year
return
and stipulation
Difference
1970
$ 319,814
$ 337,357
$ 17,543 1971
47,702
158,429
110,727 1972
77,707
167,279
89,572 1973
189,296
183,477
(5,819)
1974
271,660
254,595
(17,065)
1975
213,156
217,056
3,900 *545 Using these amounts of purchases as a starting point, respondent, through Revenue Agent Thomas Chillemi, recomputed income from the service station for the years 1970 through 1975 by using the percentage markup method. Based upon statements made to him by Mr. Frank during the audit, Revenue Agent Chillemi computed gross receipts from the sales of gasoline by adding 5 cents per gallon on the cost of gasoline purchases. Also based on statements made to him by Mr. Frank, the revenue agent computed gross receipts from the sale of oil and other lubricants and automotive parts by applying a 100 percent markup. Labor was computed as billed to customers at the cost to the service station, again based upon Mr. Frank's statements. To arrive at gross receipts from New York State automobile safety inspections, Revenue Agent Chillemi first determined the number of inspections performed by dividing the total cost to the service station of inspection stickers in each year by 50 cents, the amount Mr. Frank told the revenue agent he paid for each sticker, and by then multiplying this number by $ 3, the cost to customers for each sticker. The revenue agent then increased the gross receipts *546 of the service station by an amount approximately equal to the cost of renting the adjacent parking lot. The rental expenses claimed on the returns for 1971 through 1975 were: 1971--$ 2,450; 1972--$ 1,975; 1973--$ 2,000; 1974--$ 13,412.98; and 1975--$ 17,877. These deductions were allowed on audit, offsetting the increase in gross recepts for unreported rent. Revenue Agent Chillemi also allowed deductions as cost of sales for the amounts paid by the service station for gasoline, oil and other lubricants, automotive parts, labor, and inspection stickers. With a few exceptions, he also allowed all the other deductions claimed on the returns. Finally, the revenue agent increased the income from the service station by the amount of rebates received from Gulf Oil Company in 1970, 1974, and 1975, which were $ 9,576, $ 5,300, and $ 5,300, respectively. OPINION Reconstruction of Gross Income of Frank's Service Station
The first, and major, issue for decision is whether petitioners in their returns for the years 1970 through 1975 understated their taxable income from Frank's Service Station. If we find that income was understated, we must then determine whether respondent properly *547 computed gross income for those years by use of a markup method of estimating income. Petitioners contend initially that the cash receipts and disbursements ledgers prepared by Mr. Bergman from the bank statements, checkbook, and other records delivered to him by Mr. Frank were adequate books and records, particularly in view of the small scale of the service station business, and that respondent is therefore precluded from resorting to an indirect method of proof, such as the percentage markup method used here. Respondent counters by arguing that the records created by the accountant should not be considered adequate records because they were not contemporaneous, and because Mr. Bergman relied entirely upon Mr. Frank's unverified statements. Respondent characterizes Mr. Bergman's bank statements and checkbook analysis as simply an alternative means of attempting to indirectly arrive at gross income. Respondent believes he is under no duty to accept as adequate records such an unsubstantiated analysis. We agree with respondent that Mr. Frank failed to maintain adequate books and records and that respondent's agent was therefore justified in resorting to an indirect method of *548 proof. Section 6001 imposes on all taxpayers the obligation to keep records as prescribed by the Secretary in rules and regulations. This statutory command is implemented by section 1.6001-1(a), Income Tax Regs., which requires each person subject to income tax to: * * * keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax * * * Section 1.446-1(a)(4), Income Tax Regs., similarly dictates that each taxpayer must maintain such accounting records as will enable him to file a correct return and that these required accounting records include the taxpayer's regular books of account and such other records and data as may be necessary to support the entries on the books of account. The small size of a business may reduce the complexity of records required to be kept but it will not eliminate the duty of merchants to keep basic records accurately showing receipts and expenditures. Except for alleged credit card transactions, all payments to the service station and parking lot were in cash. However, Mr. Frank *549 maintained no contemporaneous records of gross receipts. He did not maintain adding machine tapes or even a log of the service station's receipts. At trial, Mr. Frank himself succinctly summed up him method of accounting and keeping records by stating that "my pocket was my cash register." Basically, the only record Mr. Frank contemporaneously maintained with respect to the gas station and parking lot business was the checkbook. Although this might be used to show expenditures, it cannot be used to established gross receipts. The ledger entries of gross receipts made by Mr. Bergman are entitled to little weight because they were not contemporaneous and because Mr. Bergman had no way of independently verifying information given to him by Mr. Frank. In developing the checkbook and bank deposits analysis, Mr. Bergman relied upon Mr. Frank's statement that he deposited in his savings account all the cash received from his service station and parking lot business and paid all of his personal expenses with the $ 175 per week withdrawals. But petitioners have presented no evidence other than Mr. Frank's self-serving testimony to show that all the gross receipts were deposited in the *550 bank. Petitioners contend, however, that there is another reason why the records compiled by Mr. Bergman should be accepted by the Court as adequate. Mr. Frank testified that he made credit card sales of gasoline and exchanged the credit card slips directly with Gulf Oil for more gasoline but that all these additional sales and purchases were omitted from the amounts of gross receipts and merchandise purchased that were recorded in the ledgers and reported on the returns. Mr. Bergman's testimony supports the assertion that no credit card sales or purchases were taken into account by him: he stated he was not informed of the credit card sales when he compiled the ledgers. Petitioners reason that if both credit card sales and purchases had been added to the amounts of gross receipts and purchases recorded on the ledgers and returns, an accurate computation of the total amounts of gross receipts and purchases would be arrived at. We reject this argument advanced by petitioners. First of all, they have provided the Court with no charge card slips or any other evidence that these alleged credit card sales and purchases ever existed. Moreover, even if petitioners could show that *551 the amounts reported on the returns and the ledgers when combined with purchases from Gulf Oil by use of credit card slips did accurately reflect total purchases, this would not show that the records also accurately reflected gross receipts. Furthermore, the great variation in the differences each year between the amount of purchases shown on the ledgers and returns and the amount of purchases shown on Gulf Oil Company records strongly suggests that this argument is nothing more than an after-the-fact attempt to explain the inadequacy of Mr. Frank's records. The differences in each year, which are the amounts petitioners claim were attributable to credit card sales, were: 1970--$ 17,543; 1971--$ 110,727; 1972--$ 89,572; 1973--($ 5,819); 1974--($ 17,065); and 1975--$ 3,900. Petitioners have given no explanation whatsoever why the credit card sales would very so much from year to year and actually be negative in two of the years. For all these reasons, we cannot accept petitioner's unsupported assertion that all the omitted purchases and sales were attributable to credit card transactions. Petitioners have the burden of proof under Rule 142(a). Welch v. Helvering,290 U.S. 111 (1933). *552 Petitioners have presented no evidence in support of Mr. Frank's self-serving testimony except for Mr. Bergman's testimony and the records prepared by him. Mr. Bergman had no independent knowledge of Mr. Frank's busainess, however. In determining the amounts of gross receipts, he relied on unverified information given to him by Mr. Frank. Thus, neither Mr. Bergman's testimony nor the records of gross receipts he compiled establish the truthfulness of Mr. Frank's assertions. Petitioners introduced no other evidence to support Mr. Frank's testimony, although inferentially they could have done so. For example, presumably some verification of credit card sales and the alleged exchanges could have been obtained from Gulf Oil Company. Also, no customers of the service station nor any competitors were called as witnesses. No bank statements were introduced in evidence.Even Mr. Frank's own testimony is frequently vague, inconclusive and self-contradictory. In no case is it so specific and detailed as to warrant its acceptance without some corroboration. We conclude that petitioners have not carried their burden of establishing that all the service station and parking lot receipts *553 were deposited in the bank and thus reflected in the ledgers prepared by Mr. Bergman. We therefore find the books and records to be inadequate. Because Mr. Frank had not maintained adequate records, respondent resorted to an indirect method, commonly referred to as the percentage markup method, to arrive at income from the service station and parking lot. It is well established that when a taxpayer's records are inadequate to permit verification of the entries made by a taxpayer on his or her returns, the Commissioner may resort to other means of determining the taxpayer's income, including the percentage markup method. Gibson v. United States,360 F.2d 457 (5th Cir. 1966); Stone v. Commissioner,22 T.C. 893, 905 (1954). Although not clearly expressed, petitioners seem to object to the amounts of deficiencies arrived at by respondent's use of the percentage markup method on the ground that these amounts have no correlation to the amounts that would have been found as deficiencies had the bank deposits or the net worth method been used instead. The short answer to this contention is that if a taxpayer's books are inadequate, respondent has considerable *554 discretion to choose what method of proof to use to compute omitted income, unless it is arbitrary or excessive. Webb v. Commissioner,394 F.2d 366, 372 (5th Cir. 1968); Schellenbarg v. Commissioner,31 T.C. 1269, 1277 (1959), affd. on this issue 283 F.2d 871 (6th Cir. 1960). We note, too, that use of the percentage markup method was particularly appropriate here because the amount of purchases of gasoline, oil and other lubricants could be readily computed from the Gulf Oil Company statements. Petitioners cite In re Pitt Wholesale Company,232 F. Supp. 903 (W.D. Pa. 1964), as authority for the proposition that the Commissioner cannot use the percentage markup method to reconstruct a taxpayer's income if the taxpayer has maintained some records, though not complete, from which a more accurate reconstruction of income could be made. In re Pitt Wholesale is distinguishable on its facts, however, because the taxpayer there had maintained detailed records showing daily bank deposits and had copies of all deposit slips showing the individual checks deposited. All that was missing was the taxpayer's general ledger book. *555 Here, in contrast, Frank's Service Station maintained no contemporaneous books and only fragmentary records except for the checkbook, which shows expenditures, not receipts. As we have noted, the record is unclear as to whether the bank statements would show daily deposits.In addition, there is nothing but Mr. Frank's rather vague testimony to support the contention that all receipts were deposited in the bank. At this point, an examination of how respondent computed the income from the service station and parking lot is warranted. With respect to gasoline sales, which accounted for most of the service station's business, respondent determined the amount of gasoline purchased from records of Gulf Oil Company. This was included as cost of goods sold. Revenue Agent Chillemi testified that Mr. Frank stated to him the average markup per gallon of gasoline was 5 cents per gallon. To check the reasonableness of this statement, Revenue Agent Chillemi checked other gas stations in the area and was told that the average markup was between 6 and 10 cents per gallon. He then accepted the 5 cents per gallon figure as reasonable and applied it to the gasoline purchased from Gulf Oil *556 to arrive at gross receipts. From Gulf Oil Company records and other records, respondent determined the amounts spent to purchase oil and other lubricants, automotive parts for resale and salaries and wages paid to employees. Based on statements concerning the markup of these items, which Revenue Agent Chillemi testified Mr. Frank made to him during the audit, he marked up the oil and lubricants and automotive parts 100 percent but applied no markup to labor because Mr. Frank had told him labor was billed at cost. At trial Mr. Frank testified that the markup on gasoline was 2-1/2 or 3 cents per gallon. He also testified that he purchased automotive parts at a discount of one-third over the amount he charged customers, and that oil was sold for 50 percent over cost. Mr. Bergman, who was present at the meetings between the revenue agent and Mr. Frank, could not recall any specific figures having been given as markups. Despite the claim that the service station had used markups lower than those assumed by the revenue agent, petitioners presented no testimony by customers or suppliers to support Mr. Frank's uncorroborated testimony, although apparently such testimony may have been *557 obtainable. They presented no evidence to rebut Revenue Agent Chillemi's uncontradicted testimony that the markups by other service stations in the area were from 6 to 10 cents per gallon of gasoline. Although Mr. Frank testified that factors such as the amount of street frontage of the service station and discounts to commercial accounts caused him to sell his gasoline for much less than other stations, the only support for these claims was his own uncorroborated testimony. When asked on cross-examination to name some of these commercial accounts, Mr. Frank had some difficulty recalling them and stated he no longer has any commercial accounts. We cannot assume that the missing evidence would have been favorable to petitioner. Kamborian v. Commissioner,56 T.C. 847, 869 (1971), affd. 469 F.2d 219 (1st Cir. 1972). Again, we conclude that petitioners have not met their burden of proof. One additional item of income computed under the markup method was the gross receipts on performing New York State automobile safety inspections. Revenue Agent Chillemi testified that Mr. Frank stated he paid 50 cents for each sticker and sold each one for $ 3. To *558 arrive at the number of inspections, the total amount paid to New York State was divided by 50 cents. This number was multiplied by $ 3 to get the gross sales amount, and by 50 cents to get the cost of the stickers. Two additional adjustments to income were made by respondent. The first adjustment was that rebates received from Gulf Oil Company in 1974 and 1975 were included as additional income. Respondent also added to petitioners' income in each year an amount approximating the deduction claimed by petitioners in each year for rent paid on account of the parking lot. Apparently, this resulted in charging no net profit to petitioners in each year because the rental deductions for each year were also allowed and because no gross income clearly attributable to the parking lot had been included on petitioners' returns. In general, we find respondent's reconstruction of income to be reasonable. Petitioners have presented no evidence other than Mr. Frank's uncorroborated testimony in support of their claim that the amounts of deficiencies were excessive. Because a deficiency is entitled to a presumption of correctness, petitioners have failed to carry their burden of proof. *559 Rule 142(a). Joint Returns
Having determined that respondent determined the correct amounts of deficiencies for all the years in issue, we now proceed to determine whether the returns filed for the years 1970, 1971, 1972, and 1973 are joint returns even though they were not signed by Mrs. Frank. If we find them to be individual returns of Mr. Frank, we must then decide whether he was entitled to claim a personal exemption for Mrs. Frank. Section 6013(a) provides, with certain exceptions not relevant here, that a husband and wife may make a single return jointly of income taxes. Section 1.6013-1(a)(2), Income Tax Regs., provides that a joint return of a husband and wife (if not made by an agent of one or both spouses) shall be signed by both spouses. Nonetheless, it is well settled that if an income tax return is intended by both spouses to be a joint return, the absence of the signature of one spouse does not prevent the return from being joint. Estate of Campbell v. Commissioner,56 T.C. 1, 12 (1971); Federbush v. Commissioner,34 T.C. 740, 757 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963). On the returns for 1970 *560 through 1973, the box for "Married filing jointly" was checked, Mrs. Frank's social security number and her occupation (housewife) were listed, she was claimed as a personal exemption, and the interest she received from the joint savings account was included in income. However, Mrs. Frank did not sign these returns. Petitioners try to fit this case within the tacit consent rule, under which a return signed by only one spouse may be presumed to be a joint return of both spouses. We conclude, however, that petitioners have misapprehended the tacit consent rule. We stressed in Hennen v. Commissioner,35 T.C. 747, 749 (1961), that the presumption that a spouse who did not sign a return intended for the return to be joint should be applied only when the Commissioner has determined the return to be joint because the tacit consent rule is based on the presumption of correctness afforded to the Commissioner's determinations. We held that there was a presumption against tacit consent if the Commissioner had determined that the spouse had not consented to the filing of a joint return. Similarly, there is a presumption here that Mrs. Frank did not consent to the filing *561 of joint returns for 1970 through 1973. Because the determination whether the nonsigning spouse consented to the filing of a joint return is a question of fact to be determined from the facts surrounding the filing of the returns, Helfrich v. Commissioner,25 T.C. 404, 407 (1955), the presumption of correctness afforded to the Commissioner's determination here that the returns for 1970 through 1973 were not intended to be joint can be overcome by evidence that joint returns were intended. On their face the returns appear to be joint returns, except for the fact that Mrs. Frank's signature was missing. Although Mrs. Frank did not actually state that she consented to the filing of joint returns, her testimony does show that she was a housewife totally dependent on Mr. Frank for support and management of financial matters. She had no knowledge of or involvement with the service station, and Mr. Frank gave her only a set amount of money per week for household and other expenses. Mrs. Frank was not even aware of any bank accounts in her name, and she had no other income. All her income, i.e., the interest from the savings account, was included on the returns for *562 1970 through 1973. She never filed any separate returns for these years or indicated a desire to have done so. [3] Indeed, there was no apparent reason, tax or otherwise, why she would have wanted to file separate rather than joint returns since her family unit would have been in a better financial position by filing joint returns and since she has no interest or involvement in business and tax matters. Taking all these facts into consideration, we conclude that the returns for the years 1970 through 1973 were the joint returns of Mr. and Mrs. Frank. Because we find these returns to have been joint returns, we also conclude that respondent erred by disallowing the personal exemption claimed for Mrs. Frank in each of these years. Additions to the Tax Under Sections 6651(a) and 6653(a)
We come finally to the question whether respondent *563 correctly determined additions to the tax under section 6651(a) and 6653(a). Section 6651(a) provides an addition to tax of 5 percent of the amount of tax (less any prior payments and credits) plus an additional 5 percent for each month or fraction of a month that a return is not timely filed, but the aggregate addition cannot exceed 25 percent.This addition shall not be imposed, however, if it is shown that the failure to timely file the return is due to reasonable cause and not due to willful neglect. Petitioners admit that the returns for 1970 through 1975 were all filed late. They contend, however, that there was reasonable cause for their not filing the returns on time. Irving Roggen, who had been the accountant for the gas station and who had prepared Mr. Frank's 1969 return died in 1970. Mr. Frank testified that he tried to retain an accountant after Mr. Roggen's death but was unable to do so initially because he could not get records relating to 1970 and prior years that he alleges were at Mr. Roggen's home when he died. He states that Mr. Roggen's relatives searched for the records but could not find them, either because they were disorganized or missing. Petitioners *564 contend that because no accountant would assist Mr. Frank in preparing his returns until he retained Mr. Bergman in 1973, three years after Mr. Roggen's death, he should be relieved of the addition to the tax imposed for the late filing of returns. This argument has no merit. First of all, we find it hard to believe that Mr. Frank could not have found an accountant had he seriously tried to do so. He presented no evidence, other than his own self-serving testimony, to support his claim that accountants refused to accept him as a client. Furthermore, if any accountant did refuse to prepare Mr. Frank's returns, it seems probable that such refusal would have been based primarily on his complete failure to maintain any reliable records of gross receipts, not on his inability to obtain records for prior years.Certainly, this cannot constitute reasonable cause for not filing returns when due. Therefore, Mr. Frank is liable for additions to the tax of 25 percent of the underpayment in the years 1970 through 1973, and Mr. and Mrs. Frank are jointly liable for a 25 percent addition to the tax for the 1975 underpayment and a 10 percent addition to the tax for the 1974 underpayment. *565 Section 6653(a) provides for an addition to the tax of 5 percent of the amount of underpayment if any underpayment is due to negligence or intentional disregard of rules or regulations. Petitioners maintain that Kilborn v. Commissioner,29 T.C. 102 (1957), establishes that a taxpayer should not be liable for the section 6653(a) addition because minor divergencies from a perfect system of books are not sufficient to warrant imposition of this addition to the tax. Kilborn is completely inapposite. Here, petitioners did not simply omit a minor item of income from their books and records; rather, they failed to maintain any adequate books and records whatsoever. Therefore, we hold that respondent correctly determined additions to the tax against Mr. Frank for 1970 through 1973 and against Mr. and Mrs. Frank for 1974 and 1975. Decision will be entered under Rule 155.
Footnotes
*. This case was tried before Judge Cynthia H. Hall, who has resigned from the Court. By order of the Chief Judge, dated January 13, 1982, the case was reassigned to Judge Meade Whitaker↩ for disposition.
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. It is unclear from the record whether the bank statements confirmed Mr. Frank's testimony that deposits were made daily.↩
3. Compare Teplitz v. Commissioner,T.C. Memo. 1978-45↩, in which some of the key facts supporting the Court's finding that joint returns were intended were that the wife relied upon her husband in tax matters, that she filed no separate returns, and that her income was included in the returns signed only by her husband.